**CALIFORNIA GAS PRODUCERS ASSOCIATION, Independent Oil and Gas Producers of California, Petitioners,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

**No. 23904.**

United States Court of Appeals, Ninth Circuit.

Jan. 23, 1970.

See also 9 Cir., 383 F.2d 645.

Henry F. Lippitt, II (argued), Los Angeles, Cal., for appellant.

David F. Stover (argued), Peter H. Schiff, Solicitor, Richard A. Solomon, Gen Counsel, F.P.C., Washington, D. C., Malcolm H. Furbush, San Francisco, Cal. (argued) (for Pacific Gas Transmission), Richard H. Peterson, San Francisco, Cal., John Ormasa, K. R. Edsall, Los Angeles, Cal., Charles V. Shannon, Louis Flax, of Shannon & Morley, Washington, D. C., G. Scott Cumming, Walter G. Henderson, El Paso, Tex., for appellee.

Before BARNES and ELY, Circuit Judges, and PLUMMER,* District Judge.

BARNES, Circuit Judge:

The California Gas Producers Association and the Independent Oil and Gas Producers of California have petitioned this court for review of orders issued by the Federal Power Commission (herein "FPC"), 40 F.P.C. 1147 (1968), authorizing Pacific Gas Transmission Company (herein "PGT"), a subsidiary of Pacific Gas and Electric Company (herein "PG & E") to import 200,000 Mcf of natural gas per day from Canada into northern California starting June, 1969.

Petitioners claim that the orders are deficient in two respects—i. e., that they do not contain a detailed description of the Commission's factual analysis upon which it concluded (1) that a market exists for the additional gas and (2) that the price benefits to the public of the authorization outweigh any antitrust and monopoly considerations raised by petitioners.

Our power to hear the merits of this petition is based upon section 19(b) of the Natural Gas Act. 15 U.S.C. § 717r (b) (1964).

This case arose as a result of applications to the FPC from PGT and El Paso Natural Gas Company (herein "El Paso") for authorization to import additional natural gas into California. PGT, at that time already authorized to import into California 615,000 Mcf per day, requested authority to import from Canada another 200,000 Mcf per day (100,000

* Hon. Raymond E. Plummer, Chief Judge, U. S. District Court, Anchorage Alaska, sitting by designation.

Mcf per day increases in 1968 and 1969) to sell to PG & E for resale in northern California. El Paso at approximately the same time requested authority to import 103,000 Mcf per day to PG & E for resale in northern California, 154,000 for resale by distributors in southern California, and 53,000 Mcf per day for resale by distributors in New Mexico and Arizona. The PGT and El Paso applications were consolidated for hearing by the Commission.

After research concerning the applications, the FPC staff (herein "Staff") proposed (in place of the PGT and El Paso requests, and the request of a third company TW Pipeline Company, not a party to the proceedings, to deliver an additional 110,000 Mcf per day from Texas to southern California) the authorization of a 42″ pipeline from Texas to the California border. The Staff reasoned that such a pipeline, although initially involving a greater expense than the sum of the submitted proposals, would in the long run be the most economical means of meeting California's demands for natural gas since it could ultimately handle up to 1,500,000 Mcf per day.

The Presiding Examiner resolved to minimize the risks and maximize the advantages of the Staff's proposal with what he termed his "minimax" proposal. He decided that before adopting any of the various proposals, additional hearings should be had to consider the economic merits of a large-scale operation; furthermore, he reasoned that such hearings would take at least another year, occasioning a question of adequacy of gas supply in the interim. Thus, the Examiner recommended (1) that the El Paso request which involved the expenditure of some $118 million be rejected for the present until further hearings could be had on the Staff proposal, and (2) that the PGT request which involved only an expenditure of some $21 million be granted on the condition that half of the additional 200,000 Mcf per day be released by PG & E for use in southern California. He believed that the PGT grant would sufficiently take care of the demand for gas in 1969 even though there was evidence that industrial usage of gas would have to be curtailed.

Certain evidence was placed before the Examiner concerning the issue of the supply and demand of natural gas in northern California, the area serviced by PG & E. PG & E produced the following annual market estimates for the years 1969–72, respectively: 936,244 MMcf; 979,662 MMcf; 1,022,176 MMcf; and 1,043,319 MMcf. Later, that information was supplemented by PG & E to account for the effects of delay in obtaining gas from El Paso, and for quantities of gas necessary to be obtained by PG & E for underground storage injection and compressor fuel. The totals then became as follows for the respective years: 949,100 MMcf; 992,000 MMcf; 1,032,000 MMcf; and 1,052,100 MMcf. Credibility of the PG & E demand data was enhanced when the Examiner expressly accepted PG & E's market figure for the year 1969, except for the injection volumes (see 40 F.P.C. 1187–88), and the Staff abandoned its own estimates in favor of the PG & E estimates (R. 9430, n. 2).

Concerning the matter of available supply, there was little controversy over the amount which PG & E could obtain annually from out-of-state sources (602,-000 MMcf—not counting either the proposed new increments or 21,000 MMcf of El Paso gas to be delivered to PG & E annually on a "best efforts" basis), but the evidence was conflicting vis-a-vis the California producers' ability to supply. The California producers estimated that they could continue to supply at the 1964 level for the years 1967–70. However, that estimate (228,400 MMcf/yr) was grounded on the assumption that new discoveries would be continually forthcoming. PG & E made the following annual estimates concerning the California supply: 222,300 MMcf for 1967; 232,100 MMcf for 1968; 189,200 MMcf for 1969; 153,200 MMcf for 1970; 136,200 MMcf for 1971; and 121,100 MMcf for 1972. These estimates varied from those of the

California producers since they were based on gas which was under contract, or could reasonably be expected to be under contract, and did not allow for new discoveries. Finally, the Staff made the following estimates, ultimately adopted by the Examiner (at least as to the 1969 figure—40 FPC 1188), which took into account the possibility of *some* future discoveries: 232,000 MMcf for 1968; 197,000 MMcf for 1969; 169,000 MMcf for 1970; 160,000 MMcf for 1971; and 153,000 MMcf for 1972.

As noted above, the Examiner's specific findings were limited to the year 1969. He was immediately concerned only with that year, because he reasoned that his suggested further hearings on the Staff proposal would take care of the years thereafter.

Exceptions were taken to the Examiner's report, and the Commission subsequently rejected both the "minimax" and Staff proposals and granted the original applications of PGT (100,000 Mcf./day to begin in November of 1968 and 200,000 Mcf/day to begin in November of 1969) and El Paso (103,000 Mcf./day to come into northern California beginning approximately April 1, 1969). Although the Commission recognized merit in the "minimax" and Staff proposals, it reasoned *inter alia* that neither could be implemented in time for the 1969–70 heating season.

The California producers maintained before the Commission " * * * that while a market exists for the volumes of gas proposed to be transported and sold in southern California, this is not true with respect to PGT's proposed deliveries to PG & E in northern California." 40 F.P.C. at 1152. Moreover, they maintained as they had before the Examiner " * * * that PG & E should include as a part of its gas supply available for * * * 1968 through 1972 estimates of deliverability from reserves which may be discovered in California in those years." *Id.* The Commission, however, without detailing the factual basis for its conclusion, found on the evidence before it that "[a] market exists for the pro-

posed additional sales of natural gas by Pacific Gas Transmission Company to Pacific Gas and Electric Company." *Id.* at 1164. In answer to the producer's contention concerning undiscovered reserves, the Commission said:

"The deliverability of gas from reserves yet undiscovered is at best a dubious matter. But even assuming that sufficient additional California reserves were discovered to meet PG & E's growing needs, the price PG & E pays to the California Producers is approximately 30 cents per Mcf whereas the record in this proceeding shows that the delivered price in the San Francisco area of the Canadian gas will be 26.74 cents per Mcf.

"PG & E's contracts with California Producers require that the Producers be able to deliver, for a five day period on demand, three times the daily deliverability. Thus, in spite of the relatively high price per Mcf paid the Producers under these non-regulated contracts, PG & E and its customers benefit from the peaking capacity provided. The California Producers would have us require that PG & E satisfy its growing needs from their expensive gas, necessarily losing the peaking benefits which alone could justify the price charged. We are not prepared to sacrifice the interests of the California consumers for that purpose." (*Id.* at 1152.)

The producers applied for a rehearing, pressing, *inter alia*, arguments similar to those now asserted before this court: that the Commission erred in determining that a market exists in northern California for over 300,000 Mcf per day of additional out-of-state and Canadian gas in 1969; and that the Commission failed to consider the antitrust and monopoly aspects of PG & E's northern California gas purchase program. (R. 10,106, *et seq.*) In rejecting the lack-of-a-market contention, the Commission said:

"The record shows that the market for gas in northern California will grow

over the years and that there is a market for the additional gas applied for.

\* \* \* \* \* \*

"A comparison of market requirements with the availability of gas to PG & E, including that under contracts with California producers and which can reasonably be expected from new discoveries by such producers, indicates that curtailment of gas to PG & E's steam plants will occur in each year from 1969 through 1972 if the gas now applied for is not authorized.

"We recognize that the petitioner introduced evidence purporting to counter the decline in deliverability of existing California sources predicated in the testimony of PG & E and staff and to demonstrate a considerably greater increase in new California production than that projected by PG & E or staff. The Examiner found that the staff's estimate of California supply \* \* \* was most appropriate, and we agree. We are not prepared to rely upon the much more optimistic predictions of the California producers which, even if accepted, would require an appreciable curtailment of service to the steam electric markets in 1970. Of course, in the short run PG & E may be able to take gas from the California producers at a faster rate than required under its contracts, though at the expense of accelerating the deliverability decline. We see no reason to force a revision of the arrangements under which PG & E, while its takes exceed contractual minimums, has utilized California production largely for peaking purpose." (40 F.P.C. at 1505.)

Concerning the antitrust issue, the Commission reasoned and held as follows:

"PG & E is the primary gas purchaser in Northern California and as a result of the availability of competitive supplies from outside California, is in a comparatively strong bargaining position *vis-a-vis* the California production supply   Aside from the fact that these circumstances have not prevented the California producers

from securing prices for their gas well in excess of the national average, they do not warrant action by this Commission to restrict the sources of gas to PG & E from available areas outside California at the expense of the gas consumers we were established to protect. *Cf.* United States v. El Paso Natural Gas Co., 376 U.S. 651 [84 S.Ct. 1044, 12 L.Ed.2d 12] (1964)." (40 F.P.C. at 1506.)

Thus, the application for a rehearing was denied and the producers petitioned this court for relief. They challenge only the Commission's grant of PGT's application, being content with the authorization granted El Paso Natural Gas Co.

I.

The first issue that we consider is whether the Commission adequately revealed the factual basis of its decision that a market exists for the additional sales of gas to PG & E, without detailing its findings concerning natural gas demand and supply in northern California. Producers complain that although the Commission discussed demand and supply in *qualitative* terms, it made no *quantitative* volumetric demand and supply analysis to support its conclusion.

In a recent case, FPC v. United Gas Pipe Line Co., 393 U.S. 71, 73, 89 S.Ct. 55, 56, 21 L.Ed.2d 55 (1968), the Supreme Court noted that "[b]efore the courts can properly review agency action, the agency must disclose the basis of its order and 'give clear indication that it has exercised the discretion with which Congress has empowered it,' Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 197 [61 S.Ct. 845, 85 L.Ed. 1271] (1941); otherwise the courts are propelled 'into the domain which Congress has set aside exclusively for the administrative agency.' SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)." In *United Gas* the Commission characterized United as "largely a regulated company," but made no connection between that conclusion and the basic facts it had found. 393

U.S. at 72–73, 89 S.Ct. 55. Thus, the case was remanded to the Commission for further consideration.

█ We conclude that *United Gas* does not compel us to remand the present case for further consideration. The basis upon which the Commission exercised its expert discretion, and the rational nexus between that basis and the Commission's ultimate conclusion that a market existed in northern California for an additional 303,000 Mcf/day of gas instead of the 100,000 Mcf/day recommended by the Examiner, are clearly evident from the Commission's opinion and the record. As set forth in our summary of the relevant portions of the Commission's decision and rehearing denial, *supra*, the Commission made the following points in narrative form: (1) the Staff's figures for undiscovered California reserves are reasonable and should be relied upon; (2) the preservation of peaking capacity is important for the protection of the consumer; (3) the forced use of high-priced California-produced gas would undercut the interest of the consumer; and (4) curtailment of gas to PG & E's steam plants should be avoided. (*Cf*. 40 F.P.C. at 1505.) Applying these secondary policy considerations to the volumetric evidence generally set forth, *supra*, it can be seen with some simple arithmetic why the Commission concluded that a market does exist:

Anticipated Supply and Demand,
Northern California Only

|  | 1969 | 1970 | 1971 | 1972 |
|---|---|---|---|---|
| **Demand (million Mcf)** | | | | |
| Examiner's figures (no allowance for underground storage injection): | 942 | 986 | 1029 | 1050 |
| less minimum oil purchase commitments (see Respondent's Brf, at p. 30): | —43 | —45 | —49 | —58 |
| Total Market Demand: | 899 | 941 | 980 | 992 |
| **Supply (million Mcf)** | | | | |
| Staff's figures | 197 | 169 | 160 | 153 |
| GX-2 gas (gas which El Paso can supply on a "best efforts" basis): | 21 | 21 | 21 | 21 |
| Out-of-state gas (aside from new supplies): | 602 | 602 | 602 | 602 |
| Total Market Supply: | 820 | 792 | 783 | 776 |
| Market for New Supplies (difference between total market supply and demand): | 79 | 149 | 197 | 216 |
| New Supplies (to be provided by PGT and El Paso): | 70 | 111 | 111 | 111 |
| Excess Market: | 9 | 38 | 86 | 105 |

(Compare the more conservative, but quite comparable, figures in the Brief for the Respondent at pp. 30–32.) There can be no question but that the Com-

mission was referring to the above evidence when it concluded in its opinion and in its rehearing denial that a market exists for new supplies of gas. Such evidence was submitted to the Commission solely for proof of the existence of the market, and most of it was uncontroverted. The only evidence presented by PG & E or the Staff which was seriously challenged by producers was evidence concerning future California production, and with regard to that matter the Commission was quite explicit in expressing its approval of the Staff figures. Thus, the factual basis, and the rational nexus of that basis to the Commission's ultimate determination, were made quite clear. Compare California Gas Producers Ass'n v. FPC, 383 F.2d 645, 649 (9th Cir. 1967). The record before us provides a sufficiently clear basis for a review of the agency action in question and satisfies, in our opinion, the test laid down by the Court in *United Gas*, 393 U.S. at 73, 89 S.Ct. 55 (quoted *supra*).

## II.

The second issue raised by petitioners is whether the Commission took proper account of antitrust policy in granting the PGT application. Respondents do not deny that the Commission must engage in such analysis. In a recent case, the District of Columbia Circuit Court held that failure of the FPC to make findings relating to pertinent antitrust policies, and to weigh those findings along with other public interest considerations, were grounds for remanding the case to the Commission for further consideration. Northern Natural Gas Co. v. FPC, 130 U.S.App. D.C. 220, 399 F.2d 953, 963 (1968) (the probable anti-competitive effect of the acquisition of a newly-formed company by an established company was in issue). *See also* United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964); People of California v. FPC, 369 U.S. 482 (1962); Municipal Electric Ass'n of Mass. v. SEC, 413 F.2d 1052 (D.C.Cir.1969); Pittsburgh v.

FPC, 99 U.S.App.D.C. 113, 237 F.2d 741 (1956).

Petitioners contend that the Commission "bluntly refused" to consider antitrust factors. They point to the fact that the California producers introduced evidence into the record documenting alleged restrictive gas purchase practices carried on by PG & E—the purchaser of nearly 95% of the northern California gas supply—to the detriment of the northern California dry gas producer, to wit: (1) a deliberate year-by-year underestimate of the future supply of northern California gas, *i. e.*, by estimating existing supplies, and not estimating results from exploration; (2) a deliberate *restrictive* line extension policy which limits to a minimum distance its dry gas purchase lines; (3) a refusal to install contracted-for field compressor capacity which would insure the purchase and use of available lower pressure California gas; (4) an imposition of restrictive contract conditions which have the effect of reducing the supply of California gas; (5) an imposition of individual well-by-well heat content restrictions which improperly make certain supplies "unacceptable"; and (6) an imposition of a sharp maximum purchase level for available supplies of both peaking and nonpeaking gas. We do not believe, however, that petitioners have fairly characterized the Commission's action.

The Commission's primary duty under the Natural Gas Act is the protection of the consumer. As stated by the Supreme Court in Atlantic Refining Co. v. P.S.C. of New York, 360 U.S. 378, 388, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312 (1959),

"[t]he purpose of the Natural Gas Act was to underwrite just and reasonable rates to the consumers of natural gas. * * * The heart of the Act is found in those provisions requiring initially that any 'proposed service, sale, operation, construction, extension, or acquisition * * * will be required by the present or future public conven-

ience and necessity,' § 7(e), 15 U.S.C. § 717(e), and that all rates and charges 'made, demanded, or received' shall be 'just and reasonable,' § 4, 15 U.S.C. § 717c."

The Court in *Northern Natural, supra,* recognized that although antitrust considerations " * * * are intimately involved in a determination of what action is in the public interest," 399 F.2d at 958, administrative agencies are not bound by the strict dictates of antitrust laws; "they can and do approve actions which violate antitrust policies where other economic, social and political considerations are found to be of overriding importance." *Id.* at 961.

The relationship between regulation, antitrust policy and consumer interests was described thusly by the Court in McLean Trucking Co v. United States, 321 U.S. 67, 85–86, 64 S.Ct. 370, 380, 88 L.Ed. 544 (1944):

"[T]he business affected is subject to strict regulation and supervision, particularly with respect to rates charged the public—an effective safeguard against the evils attending monopoly, at which the Sherman Act is directed. Against this background, no other inference is possible but that, as a factor in determining the propriety of motor-carrier consolidations the preservation of competition among carriers, although still a value, is significant chiefly as it aids in the attainment of the objectives of the national transportation policy." (Footnote omitted.)

Likewise, an eminent authority in the field of public utility regulation has observed that federal agencies may "properly" approve utility proposals " * * * which might have seemed to contravene antitrust policy when other considerations peculiarly within the sphere of reg-

ulatory expertise have been overriding." A.J.G. Priest, Principles of Public Utility Regulation, 17 (1969). *See also* People of State of California v. FPC, 111 U.S.App.D.C. 226, 296 F.2d 348, 353–354 (D.C.Cir.1961), *rev'd* on other grounds, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962); Panhandle Eastern Pipe Line Co. v. FPC, 83 U.S.App.D.C. 297, 169 F.2d 881, 884 (D.C.Cir.), *cert. denied,* 335 U.S. 854, 69 S.Ct. 81, 94 L.Ed. 402 (1948). *See generally* Priest, *supra,* at pp. 16–22.

■ In the case before us, although the Commission did not engage in an extensive or particularized antitrust analysis, certainly it did not "bluntly refuse" to consider antitrust factors. Indeed, the Commission indicated that it had considered the petitioner's claims but had found that they lacked merit, at least when considered against the background of no evidence that the producers had been significantly injured by PG & E's dominant market position. According to the Commission, the evidence indicated that the California producers have been continually able to secure "prices for their gas well in excess of the national average." Thus, the Commission concluded, and we think properly, that it was acting *in the interest of the gas consumer* by authorizing additional *cheaper* sources of gas for northern California. *See* United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed. 2d 12 (1964) (where the Court struck down a stock acquisition which would restrict competition to obtain Commission approval for projects to supply gas to a service area).

Upon consideration of the petition for review of the Opinion and Order of the FPC, 40 F.P.C. 1147 (1968), we decline to modify or set aside such order, in whole or in part, and we affirm it.