**MESA PETROLEUM CO., Petitioner,**
v.
**FEDERAL POWER COMMISSION,**
Respondent.
No. 28229.

United States Court of Appeals,
Fifth Circuit.
April 6, 1971.

Wm. Warfield Ross, Stephen M. Truitt, Wald, Harkrader & Rockefeller, Washington, D. C., for petitioner.

Richard A. Solomon, Former General Counsel, F. P. C., Peter H. Schiff, Sol., Washington, D. C., J. Richard Tiano, Asst. Sol., F. P. C., Gordon Gooch, General Counsel, Robert L. Russell, Asst. General Counsel, David F. Stover, Atty., Federal Power Commission, Washington, D. C., for respondent.

Before THORNBERRY, COLEMAN and INGRAHAM, Circuit Judges.

INGRAHAM, Circuit Judge:

This action was brought by petitioner, Mesa Petroleum Co., successor in interest to Hugoton Production Company, seeking review under 15 U.S.C. § 717r of an order of the respondent, Federal Power Commission, denying Hugoton's application to abandon, *nunc pro tunc*, deliveries of gas to Panhandle Eastern Pipe Line Company. Petitioner will hereinafter be referred to as "Hugoton".

The congeries of legal problems that have arisen in this action can best be understood by a thorough examination of events dating back to 1948. In that year Hugoton was organized as a subsidiary of Panhandle Eastern Pipe Line Company [hereinafter Panhandle], with gas leases in the Kansas Field as assets.

The sequence of events thereafter can be summarized as follows:

(1) In October, 1948, Hugoton contracted with the Kansas Power & Light Company [KPL] (a public utility regulated by the Kansas State Corporation Commission) for a sale over a fifteen year period calling for 15 million Mcf of gas in the first year to 24 million Mcf of gas in the fourteenth year for intrastate use alone. During these early years Hugoton was able to produce gas much in excess of KPL's requirements.

(2) Thus, on May 1, 1956, Hugoton contracted with Panhandle to sell the latter gas available after KPL's requirements had been met. The contract specified that Panhandle would buy deliveries not to exceed 20,000 Mcf a day at 15¢ per Mcf and for use only in compressor stations within the State of Kansas.[1]

(3) At the time the Hugoton-Panhandle contract was entered into, the type of sale involved was not within the Federal Power Commission's jurisdiction. However, in 1961 the Commission asserted jurisdiction over such sales in Lo-Vaca Gathering Company, 26 F.P.C. 606

---

1. The contract gave Hugoton the right to curtail or interrupt deliveries at any time and was to run for a year at a time. Between 1956 and 1965 the following volumes were delivered to Panhandle:

| | Mcf |
|---|---|
| 1956 | 4,606,272 |
| 1957 | 8,805,970 |
| 1958 | 8,943,593 |
| 1959 | 10,166,856 |
| 1960 | 8,520,962 |
| 1961 | 8,840,971 |
| 1962 | 8,232,623 |
| 1963 | 7,705,926 |
| 1964 | 8,594,583 |
| 1965 | 1,729,606 |

Joint Appendix at 27.

(1961) and was eventually affirmed by the Supreme Court in California v. Lo-Vaca Gathering Company, 379 U.S. 366, 85 S.Ct. 486, 13 L.Ed.2d 357 (1965).[2]

(4) The Hugoton-Panhandle contract expired in April, 1963, but the sales were continued on a daily basis. In addition, the Hugoton-KPL contract of 1948 was rewritten in 1962 increasing Hugoton's commitment to KPL to a maximum annual volume of 40 million Mcf and a minimum annual volume of 32 million Mcf for the years 1965 to 1982.[3]

(5) Adding to this burgeoning morass, KPL in 1963 entered a twenty year contract with Anadarko Production Company, a Panhandle affiliate, wherein Anadarko would sell no more than 10.5 million Mcf and no less than 8.4 million Mcf a year, the deliveries to commence sometime in June of 1965.

(6) On February 17, 1965, one month after the Supreme Court affirmed the Commission's *Lo-Vaca* decision granting jurisdiction over commingled compressor station gas, Hugoton terminated its sales under its contract to Panhandle with the latter's acquiescence.

(7) After this abandonment and because Anadarko was unable to develop sufficient reserves to meet its contract with KPL, Hugoton agreed to sell An-

adarko a large percentage of KPL's minimal requirements under the Anadarko-KPL contract.[4]

(8) Without conceding that the Commission had jurisdiction under the *Lo-Vaca* doctrine, Hugoton, in November of 1966, filed its petition under § 7(b), Natural Gas Act, for the abandonment which is the subject of this appeal. At the time of the Commission's proceedings, Hugoton had the following obligations to KPL:

|  | Maximum Annual Volume | Minimum Annual Volume |
|---|---|---|
| 1962 Hugoton-KPL Contract | 40,000,000 Mcf [5] | 32,000,000 Mcf |
| Anadarko Contract | 10,500,00 Mcf | 8,400,000 Mcf |
|  | 50,500,000 Mcf | 40,400,000 Mcf |

It was *after* filing this application for abandonment that Hugoton purchased Anadarko's gathering system and assumed responsibility for Anadarko's entire obligation to KPL.

The Commission ordered a hearing before an examiner to consider the application for abandonment.[6] The examiner, on November 24, 1967, ordered that the application for abandonment be denied,[7] and that the sale to Panhandle be reinstituted to the extent gas was avail-

2. The original Commission decision was reversed by this court in Lo-Vaca Gathering Company v. FPC, 323 F.2d 190 (5th Cir., 1963), but the Supreme Court affirmed the Commission, holding that sales to a pipe line, although made pursuant to a contract purporting to limit the commingled gas for compressor station use only, constitute sales for resale in interstate commerce and hence subject to jurisdiction under the Natural Gas Act.

3. Hugoton's wells were capable of producing over 50 million Mcf, but its allowable in Kansas was approximately 43.5 million Mcf.

4. It was understood this contract was to be subordinate to the Hugoton-KPL contract of 1962 and that Hugoton's obligation to Anadarko was to be a restricted one. See Joint Appendix at 15–16.

    In April of 1967 Hugoton bought Anadarko's Sante Fe gathering system and

the attached reserves, and subsequently succeeded to the entire Anadarko-KPL contract.

5. Hugoton alleged that its commitment to KPL under the 1962 contract, when added to its own shrinkage, resulted in a total of 41.2 million Mcf and this required practically all of its allowable production under Kansas law.

6. At the hearing the question was considered as to whether the price Hugoton charged Panhandle in the 1956 contract of 15¢ was "out-of-line", i. e., too high. We reject Hugoton's contention that it did not have adequate notice pertaining to this question.

7. The examiner found that KPL had not used its minimum purchase obligation up to 1966, and it planned to buy only 32.2 million Mcf in 1967 and its minimum obligation of 40.4 million Mcf for the five subsequent years.

able.[8] He also found that 13¢ per Mcf was the reasonable "in-line" price for the sale under the 1956 contract, and thus ordered refunds of amounts collected in excess of this price for the entire period of the contract.

Hugoton thereupon came forward with a settlement proposal acquiescing in the decision to reinstate deliveries on a limited basis and accepting the principle of the refunds on the basis of the 13¢ price under the so-called "Mobil" formula. This formula called for refunds of 100% of the excess amount collected since the Supreme Court's *Lo-Vaca* decision in January of 1965, and 62.5% of the excess collected between the Commission's *Lo-Vaca* decision in October 1961 and January 1965, and finally no refunds for the period before the Commission's *Lo-Vaca* opinion.[9]

The Commission's opinion, issued April 17, 1969, agreed with the examiner that no abandonment should be permitted and that a certificate of public convenience would be issued authorizing delivery to Panhandle when gas was available.[10]

The Commission rejected Hugoton's settlement offer. It found ample support in the record for the finding of a 13¢ in-line price. However, disagreeing with the examiner, the Commission found that for the pre-1961 period, i. e., prior to the Commission's *Lo-Vaca* order—the jurisdictional status of commingled gas may have been sufficiently unclear to make a refund covering that period inequitable.

As to the second period from 1961 until the termination in 1965, it found that the company was on notice that its sales might be jurisdictional, and thus the Commission ordered that Hugoton should make a full refund of the 2¢ difference between the contract price and the 13¢ in-line price for this period.[11]

Finally, as to the period following Hugoton's termination of deliveries in 1965, the Commission found what it considered to be a novel situation:

"It is not like *Despot* where the Producers after the Supreme Court's decision in *Lo-Vaca* continued to serve their pipeline customers. Rather, Hugoton illegally abandoned its sale without permission of this Commission under Section 7(b) of the Act. The result was that its affiliate, Panhandle, had to pay an average of 16.833 cents per Mcf for gas purchased elsewhere compared with the applicable in-line price of 13 cents per Mcf to Hugoton. We find no circumstances in mitigation of the Hugoton-Panhandle mistake of law. We know of no other seller involved in a *Lo-Vaca* type sale who abruptly terminated deliveries upon issuance of the Supreme Court's Opinion in *Lo-Vaca*. In Huber v. F. P. C., *supra*, the court sustained the District Court's injunction against a producer abandonment of an uncertificated jurisdictional sale dedicated prior to the first *Phillips* case, and declared that the Commission had 'no greater duty than to prevent [such abandonments]'

8. The Commission's staff agreed that KPL's requirements could be maintained along with deliveries to Panhandle at previous levels, because Hugoton had a physical capacity of 50 million Mcf per year. The examiner, however, found that Hugoton's allowable (43.5 million Mcf) could not accommodate this level of production, and could not be raised without further investment. Nevertheless, he held that some gas would be available after KPL's requirements had been satisfied, since Hugoton would be under-producing for several years by 1.5 million Mcf a year and the mere availability to Panhandle from other sources did not justify the abandonment.

9. See George Despot et al., 38 F.P.C. 1041 (1967). Under the "Mobil" formula there would have been a total refund of $358,712.00, excluding interest. Under the examiner's decision, the refund would have been $1,522,949.00.

10. The Commission found that a continuing subordinate obligation would not be detrimental to KPL, whereas an abandonment would be contrary to the public interest.

11. See Skelly Oil Co., 35 F.P.C. 849 (1966), affirmed 401 F.2d 726 (10th Cir., 1968).

(at 558). It follows, therefore, that *the Commission is under a duty, equally great, to prevent the burdens arising from illegal producer abandonments from being imposed upon the pipeline and its customers, even where there was a misunderstanding by the seller of the jurisdictional reach of the Natural Gas Act."* (Emphasis added.) Joint Appendix at 101–102 (Commission's opinion.)

Because the precise volumes of abandoned sales could not be determined, the Commission required Hugoton to report the amount it would have sold to Panhandle but for the abandonment and hold for refund, 3.833¢ per Mcf for these volumes (difference between 16.833 and 13¢ "in-line price"). The Commission estimated that the refund for the period from February 17, 1965, through December 31, 1968, would be about $270,060.00 —making the total refund ordered in the proceedings approximately $830,303.00.

Petitioner has raised three questions which this court will consider in the disposition of this case.

I. Does the Natural Gas Act [the Act] empower the Commission to make an award of "damages" to a pipeline company or its customers for injuries allegedly resulting from the producer's termination of deliveries to the pipeline?

II. Did the Commission utilize a reasonable method for measure of recovery by ordering refunds for the post-termination period?

III. Did the Commission correctly decline to accept Hugoton's settlement proposal in light of other similar proceedings?

I.

*STATUTORY AUTHORITY FOR THE REFUND ORDER*

■ Petitioner Hugoton vigorously asserts that the Commission's order of refunds, especially for the period after

the abandonment in 1965, constitutes an award of damages which, though labeled a refund, should in reality be deemed a "penalty". It is argued that the Act, neither explicitly nor by implication, grants authority to the Commission to make such an award. Petitioner contends that this attempt to *restore* the parties to the status-quo-ante, as required by the Act, is a matter of equity which is within the exclusive province of the court and not the Commission.

We hold, however, that the Commission possesses the authority to require the corrective action which it ordered in this proceeding.

■ We begin with the premise that: " * * * Congress has entrusted the regulation of the natural gas industry to the informed judgment of the Commission, and not to the preferences of reviewing courts. A presumption of validity therefore attaches to each exercise of the Commission's expertise, and those who would overturn the Commission's judgment undertake 'the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.' " Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968). See also Atlantic Seaboard Corporation v. FPC, 397 F.2d 753, 755 (4th Cir., 1968).

■ The Commission's primary purpose under the Natural Gas Act is to protect the consumer. California Gas Producers Ass'n v. FPC, 421 F.2d 422, 428 (9th Cir., 1970); Cincinnati Gas & Electric Co. v. FPC, 389 F.2d 272 (6th Cir., 1968). It must also strive to reach a balance between the consumer, producer, and those whose interests fall in between. Pan American Petroleum Corp. v. FPC, 376 F.2d 161, 168 (10th Cir., 1967). This the Commission has clearly done in the instant case.[12]

Hugoton's argument that the Commission exceeded its statutory authority and

---

12. Indeed, the Commission's action in these proceedings falls midway between the position taken by the Commission's staff and examiner on the one hand and petitioner and KPL on the other.

should be limited to the express remedies provided for in the Act can be answered by referring to § 16 of the Natural Gas Act and to its counterpart, § 309 of the Federal Power Act.[13] Both provisions have received broad interpretations to enable the Commission to effectively regulate the gas and power industries. For example, we turn to Niagara Mohawk Power Corp. v. FPC, 126 U.S.App.D.C. 376, 379 F.2d 153 (1967), wherein a company had constructed dams without applying for a license as required by the Federal Power Act. The Commission issued licenses backdated to what it considered appropriate dates. The court upheld the order resulting in this retrospective liability for the annual charges payable by the licensee. The company's arguments in the *Niagara* case were nearly identical to those submitted by Hugoton. 379 F.2d at 157. The court, in rejecting such arguments, explained:

"The case presents no question of Congressional power, but only a question of construction of the scope of administrative discretion entrusted to respondent Commission under the Act. The Commission's authority to establish effective dates of licenses earlier than the date of issuance, while not expressly set forth in the Act, is fairly implied, assuming reasonable exercise of the authority. The Act is not to be given a tight reading wherein every action of the Commission is justified only if referable to express statutory authorization. On the contrary, the Act is one that entrusts a broad subject-matter to administration by the Commission, subject to Congressional oversight, in the light of new and evolving problems and doctrines.

"In support of this conclusion we note first the familiar provision, contained in this Act as Section 309, authorizing the Commission 'to perform any and all acts, and to prescribe * * such orders * * * as it may find necessary or appropriate to carry out the provisions of [the Act].' *While such 'necessary or appropriate' provisions do not have the same majesty and breadth in statutes as in a constitution, there is no dearth of decisions making clear that they are not restricted to procedural minutiae, and that they authorize an agency to use means of regulation not spelled out in detail, provided the agency's action conforms with the purposes and policies of Congress and does not contravene any terms of the Act.*" (Emphasis added.) 379 F.2d 158.

Furthermore, in *Niagara*, as in the instant case, a major factor was that the Commission was seeking enforcement of its regulatory authority, and thus the court in that case said:

"Finally, we observe that the breadth of agency discretion is, if anything, at zenith when the action assailed relates

---

13. § 16 of the Natural Gas Act, 15 U.S.C. § 717o, reads as follows:

"The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter. Among other things, such rules and regulations may define accounting, technical, and trade terms used in this chapter; and may prescribe the form or forms of all statements, declarations, applications, and reports to be filed with the Commission, the information which they shall contain, and the time within which they shall be filed. Unless a different date is specified therein, rules and regulations of the Com-

mission shall be effective thirty days after publication in the manner which the Commission shall prescribe. Orders of the Commission shall be effective on the date and in the manner which the Commission shall prescribe. For the purposes of its rules and regulations, the Commission may classify persons and matters within its jurisdiction and prescribe different requirements for different classes of persons or matters. All rules and regulations of the Commission shall be filed with its secretary and shall be kept open in convenient form for public inspection and examination during reasonable business hours."

§ 309, 16 U.S.C. § 825h, employs identical language.

primarily not to the issue of ascertaining whether conduct violates the statute, or regulations, but rather to the fashioning of policies, remedies and sanctions, including enforcement and voluntary compliance programs in order to arrive at maximum effectuation of Congressional objectives." 379 F. 2d at 159.

■ We likewise reject Hugoton's contention that the post-abandonment refund order was an "equity matter" to be handled solely by a court. As the court in *Niagara* held:

"It is indeed a 'familiar principle of equity * * * to regard as being done that which should have been done.' But the Commission did not suppose it had a broad equity charter. At most it referred to this principle as showing that its course was reasonable. The principles of equity are not to be isolated as a special province of the courts. They are rather to be welcomed as reflecting fundamental principles of justice that properly enlighten administrative agencies under law. The courts may not rightly treat administrative agencies as alien intruders poaching on the court's private preserves of justice. Courts and agencies properly take cognizance of one another as sharing responsibility for achieving the necessities of control in an increasingly complex society without sacrifice of fundamental principles of fairness and justice." 379 F.2d at 160.

Nor do we perceive any reason to characterize the Commission's action as a penalty. Though not a controlling factor, Hugoton never established that it would be in a worse economic position after paying the refunds—a relevant consideration, since after the abandonment Hugoton possessed quantities of gas

available for sale elsewhere and from all indications, at a higher rate.

In the specific area of ordering refunds, the Commission's authority under § 16 remains broad. In FPC v. Tennessee Gas Transmission Co., 371 U.S. 145, 83 S.Ct. 211, 9 L.Ed.2d 199 (1962), involving the authority to order interim rate reductions and refunds of amounts collected in excess thereof, the Court held:

"It is, therefore, the duty of the Commission to look at 'the backdrop of the practical consequences [resulting] * * * and the purposes of the Act,' Sunray Mid-Continent Oil Co. v. Federal Power Comm'n, 364 U.S. 137, 147, 80 S.Ct. 1392, 1399, 4 L.Ed.2d 1623 (1960), in exercising its discretion under § 16 to issue interim orders and, where refunds are found due, to direct their payment at the earliest possible moment consistent with due process." 371 U.S. at 155, 83 S.Ct. at 216–217.

Hugoton asserts that § 16 grants no power to the Commission unless some other specific section of the Act is involved, citing FPC v. Panhandle Eastern Pipe Line Co., 337 U.S. 498, 69 S.Ct. 1251, 93 L.Ed. 1499 (1949). In the first place, we have established that the authority conferred by § 16 has been broadly construed. Indeed, "Section 16 demonstrates a realization by Congress that the Commission would be confronted with unforeseen problems of administration in regulating this huge industry and should have a basis for coping with such confrontation." Public Service Commission of New York v. FPC, 117 U.S.App. D.C. 195, 327 F.2d 893, 897 (1964).

Secondly, the Commission was carrying out its duties of certification under § 7 of the Act.[14] In United Gas Im-

14. § 7(b) specifically provides:
"No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment." 15 U.S.C. § 717f(b).

provement Co. v. Callery Properties, 382 U.S. 223, 86 S.Ct. 360, 15 L.Ed.2d 284 (1965), the Court held that the Commission, in order to implement its duties under the certificate provisions of § 7 and to protect the public interest, could require refunds (measured by the difference between the original contract rates which it had erroneously sanctioned and the in-line prices) to correct abuses preceding the final certification, notwithstanding that the service had been initiated without a refund condition. We reject the contention that because no sales occurred after 1965 that it should take the instant case out of the line of authorities we have cited establishing the Commission's authority.

There is also no basis for Hugoton's claim that, since the Commission lacks authority to award reparations, it is also without authority to correct a failure to comply with the certificate provisions of the Natural Gas Act by an unauthorized abandonment. United Gas Improvement Co. v. Callery Properties, *supra.* See also FPC v. Sunray DX Oil Co., 391 U.S. 9, 44–46, 88 S.Ct. 1526, 20 L.Ed.2d 388 (1968).[15]

■ Finally, it is of no consequence that there were other avenues which the Commission could have chosen for enforcement, such as an injunction, or a criminal proceeding.[16] Section 20 of the Act does not provide an exclusive remedy. The Commission may resort to the courts only if in its discretion it believes the court's help would be necessary to achieve its purposes. The mandamus remedy is permissive, not exclusive. Jupiter Corporation v. FPC, 137 U.S.App. D.C. 295, 424 F.2d 783, 791 (1969). The Commission obviously felt that the abandonment action by Hugoton was an affront to its regulatory authority and it was fully warranted in the form of remedy chosen.

---

§ 7(c) provides in pertinent part:
"No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, * * * unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations * * *." 15 U.S.C. § 717f (c).

§ 7(e) provides:
"Except in the cases governed by the provisos contained in subsection (c) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; oth-

erwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require." 15 U.S.C. § 717f(e).

15. The *Callery* decision indicates that the Commission has authority to correct improper actions occurring prior to a permanent certificate of determination. As respondent points out. though the corrective action ordered in the instant case is not the same as that in *Callery*, it is no more a prohibitive retroactive revision of a filed rate than were the *Callery* and *Sunray* refunds.

16. See § 20(a) of the Act, 15 U.S.C. § 717s(a), where the Commission in the event of a violation of the provisions of the Act may "in its discretion bring an action in the proper district court of the United States, or the United States courts of any territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond."

## II.

### REASONABLENESS OF THE POST-TERMINATION REFUNDS

■ Petitioner Hugoton asserts that there is no support for the finding of injury to Panhandle as a result of the abandonment, that it is "improbable" that the termination had any effect whatsoever on Panhandle or its customers, and that the Commission ignored Hugoton's paramount obligation to KPL.

Indeed, Panhandle made no objection to the termination. We reiterate, however, that Panhandle and Hugoton were affiliates. The goal of the Commission is to protect the consumer. This court has recently held that the Commission may direct refunds to the pipeline's customers rather than to the pipeline itself. Texas Eastern Transmission Corp. v. FPC, 414 F.2d 344 (5th Cir., 1969), cert. den. 398 U.S. 928, 90 S.Ct. 1817, 26 L.Ed. 2d 89 (1970).

We must consider more than this "improbability" of which Hugoton speaks. We must also recognize the need for certainty and respect for the Commission's regulatory power. We must recognize that Panhandle faced a long range situation of increasing demand. Should petitioner Hugoton now be allowed to assert that the sale to Panhandle was insignificant? We think not.

There was ample support in the record for the Commission's finding that Panhandle had to pay a higher price for gas purchased from other sources, and thus that refunds were necessary for the period after the termination as long as gas was available. Even if there was no "open and obvious" impairment to the Panhandle system because comparatively small amounts of gas were involved, when gas was flowing, Panhandle depended on it in applying for a certificate of public convenience and necessity. Panhandle's

customers deserve some protection as well as KPL and its customers.

The Commission itself noted that in 1965 and 1966 only 31.5 and 31.7 million Mcf of gas were purchased from Hugoton by KPL. It is clear to this court that for at least two years after the unlawful abandonment some gas was available for sale to Panhandle,[17] although afterwards there was uncertainty since Hugoton's deliveries to Panhandle would have been much reduced after Hugoton bought out the Anadarko contract in mid-1967.

The Commission recognized that in 1968 Hugoton had over-produced its Kansas allowable, and thus no gas was available for Panhandle. The Commission acknowledged that the computation it made for the period from February 17, 1965, to May 1, 1967, was an estimate based upon information available at the time. It therefore ordered Hugoton to file a report

" * * * showing the volumes of gas sold to and the amount of money collected by it from Panhandle during the period October 24, 1961 to February 17, 1965 in excess of 13.0 cents per Mcf at 14.65 psia and the volume of gas sold and the amount of money it would have collected during the period February 17, 1965 to the date of the report taking into account the Kansas allowables, KPL's requirements and other circumstances referred to in this opinion."

Thus, the computation was subject to modification if the report so indicated, and the Commission apparently went out of its way to be fair and reasonable.

The Commission also reviewed the examiner's findings and was certain that the use of a 13¢ in-line price was correct. We find substantial evidence in the record to support this conclusion. The Commission has broad discretion in findings of this nature, FPC v. Sunray DX Oil

17. See notes 7 and 8 *supra*. The combined volumes purchased by KPL in 1966 under the Hugoton and Anadarko contracts together totaled only 38.7 million Mcf, compared to the minimum contract deliveries of 40.4 million Mcf. The subsequently incurred obligation through Anadarko does not explain the prior statutory violation by Hugoton.

Co., *supra*, and as this court stated in Continental Oil Co. v. FPC, 378 F.2d 510, 532 (5th Cir., 1967):

> "We think it basic that the in-line price technique was developed by the courts to make sure that the public interest, with its strong emphasis on consumer interest, was to be protected from the outset against excessive rates and charges. This is not to say that the power to refund *must* be exercised. If, as and when the power is exercised it must be shown that all equitable considerations involved have been explored and given due weight in the conclusion reached" [18]

The Commission acted legally and correctly in ordering the "post-termination" refunds for the difference between the 13¢ in-line price Panhandle would have been required to pay but for the abandonment, and the average cost to Panhandle for replacement of gas unlawfully withheld.

### III.

### THE SETTLEMENT PROPOSAL

Hugoton's final contention is that the Commission offered no adequate explanation for denying it the benefits of the so-called "Mobil" formula, which was applied to several producers who suddenly found themselves subject to Commission regulation after the *Lo-Vaca* decision in 1961.[19]

Concerning the three periods of time with which the Commission was concerned and as set out above, we note that as to the first period, the Commission adopted the same approach utilized in the *Despot* proceedings, ordering no refunds for the pre-1961 period.

For the third period, the Commission found a "novel situation," which definitely distinguished Hugoton's case from the *Despot* proceedings, i. e., the illegal abandonment. As we have established in parts I and II, we fully accept the Commission's corrective measures applicable to the post-abandonment period. The Commission was not required to use the *Despot* settlement package in view of its careful explanation of the distinguishing features.

■ However, we have some sympathy for petitioner Hugoton's arguments with respect to the second period from October of 1961 until the Supreme Court's affirmance in 1965. The re-

---

18. The court went on to explain that:
"The argument that excessive rates in *Callery* were collected pursuant to permanent certificates, the issuance of which was still the subject of judicial review, while the excesses here were accumulated under temporary authorizations that were not subject to judicial scrutiny, does not carry the day. The Producers knew that the authorizations they received were *temporary*, granted *ex parte* to provide interim relief. The contingency of the temporaries was made known to the recipients by the express condition embodied in them that:
" 'This constitutes all requisite temporary authorization to commence the sale of gas, but such authorization and acceptance of the rate schedule are without prejudice to such final disposition of the certificate application as the record may require.'
"Whether or not this is characterized as 'boiler plate' language it was suffi-

cient in our opinion to put the Producers on notice of the possibility that refunds of excessive amounts might ultimately be required so that no higher price might be retained than the Producer was entitled to receive under a properly conditioned permanent certificate."

19. See note 9, *supra*, and accompanying text. For purposes of clarity we reiterate that under the "Mobil" formula the settlements in the *Despot* proceedings called for: (1) no refunds of amounts collected in excess of the in-line price before the Commission's *Lo-Vaca* decision; (2) 62.5% of the amounts collected in excess of the in-line price for the period between the Commission's decision [October 1961] and the Supreme Court's affirmance on January 18, 1965; (3) 100% of the amounts collected in excess of the in-line price from the date of the Supreme Court's opinion onward.

spondent Commission argues that Hugoton was on notice from the beginning of this period that the sale would probably be jurisdictional. But the producers in the *Despot* cases were similarly on such notice and yet they were required to refund only 62.5% and not 100% of the amounts collected between the dates of the Commission's and the Supreme Court's decisions in *Lo-Vaca*. The Commission's counsel urged that Hugoton's abandonment justifies the discriminatory treatment for the period prior to the Supreme Court's decision. This court cannot understand how the subsequent abandonment has a bearing on the different treatment for this second period when Hugoton seemingly was on an equal footing with the other producers.

The sole rationale given by the Commission itself was that the *Despot* proceedings involved a different procedural posture and reflected a settlement permitting avoidance of litigation and expense.

We do not find the procedural differences to be so obvious as to remove the need for careful explanation, nor does the record show what expenses were involved. We thus remand this point for a cogent explanation by the Commission of the different treatment given Hugoton and its relevance to the Natural Gas Act solely with respect to the period between the Commission's *Lo-Vaca* opinion and the Supreme Court's affirmance on January 18, 1965. Melody Music, Incorporated v. FCC, 120 U.S.App.D.C. 241, 345 F.2d 730, 732–733 (1965). See also Marriott In-Flite Service Division of Marriott Corp. v. NLRB, 417 F.2d 563, 565 (5th Cir., 1969). If the Commission cannot explain the discrimination, it should forgive 37.5% of the refund ordered for this second period. In all other respects, the Commission's order is enforced.

Enforcement granted in part and remanded in part with directions.