**NIAGARA MOHAWK POWER CORPORATION, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

No. 19887.

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 18, 1966.

Decided May 18, 1967.

Petition for Rehearing Denied June 12, 1967.

Mr. Lauman Martin, Syracuse, N. Y., for petitioner.

Mr. George F. Bruder, Atty., F. P. C. with whom Messrs. Richard A. Solomon, Gen. Counsel, Howard E. Wahrenbrock, Sol. at the time the brief was filed, Peter H. Schiff, Deputy Sol., and Joseph B. Hobbs, Atty., F. P. C., were on the brief, for respondent.

Before FAHY,* DANAHER and LEVEN-THAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

Petitioner, Niagara Mohawk Power Corporation, is an electric utility that operates and maintains four hydroelectric projects on navigable waters within the State of New York. It seeks review of orders of the Federal Power Commission, issued in 1963 and 1964,[1] which granted licenses for these projects, insofar as they specified 1941 and 1949 effective dates for the licenses granted.

Each of the licenses issued by the Commission to petitioner contains the usual provisions requiring that the licensee pay annual charges under Section 10(e) of the Federal Power Act for the purpose of reimbursing the United States for costs of administration, and requiring that it establish amortization reserves under Section 10(d) from excess profits earned after the project has been in operation for twenty years.[2]

---

* Circuit Judge Fahy became Senior Circuit Judge on April 13, 1967.

1. The orders may be found at 29 FPC 1290; 31 FPC 1549; 32 FPC 125, 1404. The petition for review is under Section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l* (1964).

2. Section 10 of the Act is codified at 16 U.S.C. § 803 (1964). Section 10(d) provides:

"That after the first twenty years of operation, out of surplus earned thereafter, if any, accumulated in excess of a specified reasonable rate of return upon the net investment of a licensee in any project or projects under license, the licensee shall establish and maintain amortization reserves, which reserves shall, in the discretion of the Commission, be held until the termination of the license or be applied from time to time in reduction of the net investment. Such specified rate of return and the proportion of such surplus earnings to be paid into and held in such reserves shall be set forth in the license."

Section 10(e) provides in pertinent part:

"That the licensee shall pay to the United States reasonable annual charges in an amount to be fixed by the

Petitioner's complaint is that those provisions should not have been made effective retroactively, as of a date prior to the issuance of the order. The significance of the provision for amortization reserves appears from the provisions of Section 10(d) and Sections 14 and 16: The Commission may in its discretion apply these amortization reserves to reduce the net investment in the project; the net investment, not to exceed the fair value, plus severance damages, is the amount for which the project upon expiration of its license may be taken over by the United States or transferred to a new licensee.

## I

The pertinent statutory and administrative background begins with the Federal Water Power Act of 1920 [3] —which reflected "a major change of national policy" and the Congressional intention to go beyond a mere prohibition of obstructions to navigation and achieve instead "a comprehensive development of national resources." [4] The basic provisions of Sections 10, 14 and 15 were in the 1920 act. But the 1920 act reflected deficiencies in administration and implementation. In 1930 the Federal Power Commission, previously a committee of cabinet officers, was reorganized as an independent commission.[5] In the Public Utility Act of 1935 [6] Congress amended the 1920 law and made it Part I of the Federal Power Act. Section 23(b), as amended in 1935 (16 U.S.C. § 817), expressly makes it unlawful not only to construct but also to operate or maintain any project works in any navigable water of the United States without a license issued under the Act or a valid permit issued prior to adoption of the 1920 act. The law also makes clear that after 1935 no project could lawfully be constructed in non-navigable waters over which Congress has jurisdiction without the filing of a declaration of intention with the Commission and its determination that such construction would not affect the interests of interstate or foreign commerce. The courts have made clear that since the use of the flow of a navigable stream reflects a revocable license not tantamount to a "vested right," the license provisions of the Act governing electric power projects are a regulation of commerce that must be accepted by one maintaining a project in a stream now held navigable even though the project was constructed at a time when the river was not considered a navigable waterway.[7]

Notwithstanding the statutory requirements, many hydro-electric projects have been operated, and many constructed, without the requisite authorization. Petitioner did not file applications for licenses for these projects until 1962. Yet the first three projects, built before 1935, were in reaches of the Sacandaga River (Project 2318) and Raquette River (Projects 2320 and 2330) that the Commission had in 1949 determined to be navigable waters.[8] And in 1941 it constructed Project 2424 on the Erie Canal, which is part of the New York State Barge Canal System, without any declaration or application for authorization

Commission for the purpose of reimbursing the United States for the costs of the administration * * * and in fixing such charges the Commission shall seek to avoid increasing the price to the consumers of power by such charges, and any such charges may be adjusted from time to time by the Commission as conditions may require * * *."

3. Act of June 10, 1920, 41 Stat. 1063.

4. First Iowa Hydro-Electric Cooperative v. FPC, 328 U.S. 152, 180–181, 66 S.Ct. 906, 919, 90 L.Ed. 1143 (1946).

5. Act of June 23, 1930, 46 Stat. 797.

6. Act of August 26, 1935, 49 Stat. 838.

7. United States v. Appalachian Elec. Power Co., 311 U.S. 377, 424–429, 61 S.Ct. 291, 85 L.Ed. 243 (1940); Pennsylvania Water & Power Co. v. FPC, 74 App.D.C. 351, 357–359, 123 F.2d 155, 161–163 (1941), cert. denied, 315 U.S. 806, 62 S. Ct. 640, 86 L.Ed. 1205 (1942).

8. New York Power and Light Corp., 8 FPC 231; Central New York Power Corp., 8 FPC 390.

although it was in 1903 that the Supreme Court had found the Erie Canal to be a navigable water of the United States.[9]

The Commission's orders assigned 1949 effective dates and a 1993 termination date for the licenses governing the first three projects. The 1964 order granting a license for Project 2424 assigned an effective date of July 1, 1941 and a termination date of June 30, 1991. The Commission granted the rehearing sought by petitioner and adhered to these dates.[10]

Petitioner does not complain to us of the termination dates of the licenses,[11] but contends that the Commission had no authority whatever to set effective dates prior to issuance dates of the licenses. It does not argue in the alternative that if the Commission had this power it acted unreasonably or abused its discretion. Even so we think it helpful to retrace the path of the Commission's exercise of the power it considered within the ambit of its authority.

The various licensing orders set forth that the effective dates had been established in accordance with the Commission's so-called *Androscoggin*[12] decision, and we begin by reviewing at some length the principles there laid down. That case involved a project constructed before 1935, although the dam was rebuilt in 1958. The Company applied for a license in 1960 after the Commission, in another proceeding, found that the Androscoggin River was a navigable water of the United States on the basis of its use for transportation of logs. In the *Androscoggin* opinion, discussing a compliance problem that had "perplexed the Commission for many years," the Commission identified three principal factors to be taken into account.

(1) The licensee should not reap a windfall from the delay in filing. "To the extent feasible, it is the burden of a sound licensing policy to minimize such inequities." (27 FPC at 833).

(2) The Commission's past failure, for want of funds or manpower, to enforce general compliance and the large number of projects that had operated without a license since 1935 indicated the need for a discriminating approach in order to cope with the compliance problem.

(3) In regard to termination date the Commission took realistic account of the significance of certain 1943 decisions[13] holding navigable a stream usable for log transport, and thus giving notice of the perils of further unlicensed operation to the owner of a project in such a stream. And so the Commission fixed December 3, 1993—fifty years after that 1943 notice—as the termination date of the Androscoggin license.

As to effective date, the Commission rejected use of date of issuance since this would encourage delay in filing the license applications which the law requires. But the Commission decided not to use as an effective date the earliest

---

9. The Robert W. Parsons, 191 U.S. 17, 28, 24 S.Ct. 8, 48 L.Ed. 73.

10. After petitioner accepted the licenses for the three earlier projects—it has not yet accepted the license tendered for Project 2424—the Commission issued statements of annual charges, totaling $174,259 for administrative costs for these projects from the 1949 effective dates through 1963. After granting petitioner's application for rehearing of these statements and the order issuing the license for Project 2424, the Commission held that the annual charges had properly been assessed from the effective dates

stated in the licenses, and that the amortization reserve provisions had likewise been properly related back to the stated effective dates.

11. It may be noted that Section 6 of the Act provides that licenses are to be issued for not more than fifty years. 16 U.S.C. § 799 (1964).

12. Public Serv. Co. of New Hampshire, 27 FPC 830 (1962).

13. City of Spooner, Wisconsin, 3 FPC 986; Wisconsin Michigan Power Co., 3 FPC 449; Wisconsin Pub.Serv. Corp., 3 FCP 495.

date it felt it could justify.[14] It did not even select the 1943 date of the decisions on navigability—used as a reference point for setting the termination date—though this treatment "would be a legitimate exercise of our discretion." Instead the Commission announced a general policy for future cases of tendering licenses effective April 1, 1962, the month of the *Androscoggin* decision, for cases that do not involve a prior finding of navigability on the particular river, an unauthorized construction after 1935, or other unusual circumstances (*e. g.*, expenses due to applicant's recalcitrance). However, it believed a stricter policy was required for the Androscoggin case because there was a flagrant breach of statutory duty in 1958 when applicant failed to apply for a license even after the Commission's determination of jurisdiction over the *Androscoggin* River. It stated that it had avoided a date prior to 1958, lest this deter potential applicants from coming forward to comply with the statute, but might reconsider if experience shows that voluntary cooperation is not forthcoming in any event.

In selecting effective dates for petitioner's four projects, the Commission used a 1949 date for the pre-1935 projects which were constructed at a time when it might have been reasonably assumed that no license was required for construction on rivers like the Sacandaga and Raquette. Although the 1943 decisions on the logging criterion were notice of an obligation to file for a license, the Commission used the 1949 date of the decisions on the navigability of the particular rivers.

Project 2424 was governed by the stricter standard that *Androscoggin* warned was applicable to post-1935 construction begun without filing either a license application or declaration of intention, notwithstanding the express requirements of Section 23(b) of the Act. The Commission used the 1941 date on which Project 2424 was constructed, since the Erie Canal had long ago been determined to be a navigable water.

## II

We conclude that the Commission does have statutory authority to assign an effective date earlier than the date of the issuance of the license when the project involved was one constructed or maintained without a license in violation of applicable law. We are in accord with the results of the decisions of the First Circuit. *Central Maine Power Co. v. FPC*, 345 F.2d 875 (1st Cir. 1965); *Bangor Hydro-Electric Co. v. FPC*, 355 F.2d 13 (1st Cir. 1966).

Petitioner relies on three contentions: that in the absence of clear expressions to the contrary, legislation must be construed to avoid retrospective application;[15] that the retroactive ascertainment of administrative charges is a penalty not specifically authorized by statute, and the legislature was careful to specify the particular instances in which a penalty might be collected for a default;[16] and that the Commission ex-

---

14. See 27 FPC at 833, stating that the license could have been made effective as of 1935 (or even earlier). "We are persuaded, however, to allow for the fact that the concept of navigability has evolved only gradually and did not attain its present dimensions until 1943."

15. Union Pac. R. R. v. Laramie Stock Yards Co., 231 U.S. 190, 199, 34 S.Ct. 101, 58 L.Ed. 179 (1913); Claridge Apartments Co. v. Commissioner, 323 U.S. 141, 164, 65 S.Ct. 172, 89 L.Ed. 139 (1944); Arizona Grocery Co. v. Atchison, T. & S. F. Ry., 284 U.S. 370, 389, 52 S. Ct. 183, 76 L.Ed. 348 (1932).

16. See Section 13, 16 U.S.C. § 806 (1964), for failure to complete project construction; Section 17(b), 16 U.S.C. § 810 (1964), for delinquency in payment of annual charges; Sections 18, 16 U.S.C. § 811 (1964), and 316(b), 16 U.S.C. § 825o (1964), for willful violation of rules and regulations of Secretary of the Army; Section 307(c), 16 U.S.C. 825f (1964), for willful failure to testify or produce documents; Section 314(a), 16 U.S.C. § 825m (1964), for willful violation of the Act, rules, regulations, or orders; Section 315(a), 16 U.S.C. § 825n (1964), for willful failure to comply with orders,

ceeded its authority in arrogating to itself the power of an equity court, here deciding the matter on the equity principle of regarding as done that which should have been done, rather than adhering to its legislative character.

■■ The case presents no question of Congressional power, but only a question of construction of the scope of administrative discretion entrusted to respondent Commission under the Act. The Commission's authority to establish effective dates of licenses earlier than the date of issuance, while not expressly set forth in the Act, is fairly implied, assuming reasonable exercise of the authority. The Act is not to be given a tight reading wherein every action of the Commission is justified only if referable to express statutory authorization. On the contrary, the Act is one that entrusts a broad subject-matter to administration by the Commission, subject to Congressional oversight, in the light of new and evolving problems and doctrines.

■ In support of this conclusion we note first the familiar provision, contained in this Act as Section 309, authorizing the Commission "to perform any and all acts, and to prescribe * * * such orders * * * as it may find necessary or appropriate to carry out the provisions of [the Act]." [17] While such "necessary or appropriate" provisions do not have the same majesty and breadth in statutes as in a constitution, there is no dearth of decisions making clear that they are not restricted to procedural minutiae, and that they authorize an agency to use means of regulation not spelled out in detail, provided the agency's action conforms with the purposes and policies of Congress and does not contravene any terms of the Act.[18]

Second we stress the undeniable significance, in showing latitude accorded to the Commission, of the statutory provisions authorizing the Commission to issue licenses on conditions. Section 6 of the Act makes licenses subject not only to the conditions written into the Act by Congress, but also such additional conditions as may be required by the Commission. Section 10(g) specifically authorizes the Commission to attach such "conditions not inconsistent with the provisions of this Act as the commission may require."

■ The statutory authority to issue certificates or permits on conditions implies broad authority to take effective action to achieve regulation in the public interest. We are mindful of the liberal interpretation the Supreme Court has given similar provisions in other statutes as reflecting a broad authority, and in appropriate cases a correlative duty, to effectuate the public interest.[19]

---

rules, or regulations, or to respond to a subpoena or make an appearance, or to submit information or documents in the course of investigations; and Section 316 (b), 16 U.S.C. § 825o (1964), for willful violations of rules, regulations, restrictions, conditions, or orders of the Commission.

17. 16 U.S.C. § 825h (1964).

18. *See, e. g.,* Public Serv. Comm'n of State of New York v. FPC, 117 U.S.App.D.C. 195, 198–199, 327 F.2d 893, 896–897 (1964). *See generally,* United States v. Storer Broadcasting Co., 351 U.S. 192, 203, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); American Airlines, Inc. v. CAB, 123 U.S. App.D.C. 310, 313–314, 359 F.2d 624, 627–628 (en banc), cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966).

In sharp contrast are limited statutory provisions like those considered in Blair v. Freeman, 125 U.S.App.D.C. 207, 370 F.2d 229 (1966).

19. *See, e. g.,* Atlantic Ref. Co. v. Public Serv. Comm'n of New York ("CATCO case"), 360 U.S. 378, 391–392, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959).

*Compare* United States v. Appalachian Elec. Power Co., 311 U.S. 377, 61 S.Ct.

As for the Act here involved, we agree with the observation of the Third Circuit, that Congress intended by Section 10(g) "to give to the Commission wide latitude and discretion in the performance of its licensing and regulatory functions." Metropolitan Edison Co. v. FPC, 169 F.2d 719, 723 (3d Cir. 1948).

■ Finally, we observe that the breadth of agency discretion is, if anything, at zenith when the action assailed relates primarily not to the issue of ascertaining whether conduct violates the statute, or regulations, but rather to the fashioning of policies, remedies and sanctions, including enforcement and voluntary compliance programs in order to arrive at maximum effectuation of Congressional objectives.[20] This source of discretion is available not only where an agency has the explicit power to impose penalties (see cases cited note 20), but also where the agency's order, though having aspects of determination of individual fault, is a denial to a wrongdoer of participation in a Government program generally extended to businessmen, for the purpose of maintaining the fairness, equity and efficiency of the program.[21] Here the case is stronger, for petitioner seeks a license or privilege. While that license may not be unreasonably or unlawfully withheld, it certainly need not be extended to an applicant not ready to redress his default by discharging the duty he should

by rights have assumed without nudging.

By these standards the actions under review, being reasonable, are within respondent's authority. The effective date used by the Commission to measure the extent of petitioner's obligation under its license reflects an effective date of default that gives petitioner the benefit of any doubt. We have already discussed the Commission's policies in selecting effective dates earlier than the license issuance date. The Commission has made a reasonable effort to use a discriminating approach in order to avoid invidious discrimination. That is, the Commission's selection of effective dates takes account of narrow differences in situations in order to avoid a gross approach that would favor wrongdoers. While perfection in this effort may be unattainable, as petitioner suggests, nothing presented to us bears a taint of unreasonableness.

This reasonable exercise of administrative authority is not to be gainsaid by maxims that are good enough as generalities but do not undercut the kind of actions under review. Thus, an agency's authority to impose penalties may not be lightly inferred, but the term "penalty" is hardly appropriate for a condition that puts the wrongdoer in no worse stance than the company that has punctiliously observed the requirements of law, and is not made collectible in any

291, 85 L.Ed. 243 (1940) ; Michigan Consol. Gas Co. v. FPC, 108 U.S.App.D.C. 409, 283 F.2d 204, cert. denied *sub nom.*, Panhandle Eastern Pipe Line Co. v. Michigan Consol. Gas Co., 364 U.S. 913, 81 S. Ct. 276, 5 L.Ed.2d 227 (1960) ; City of Pittsburgh v. FPC, 99 U.S.App.D.C. 113, 237 F.2d 741 (1956) ; Scenic Hudson Preservation Conference v. FPC, 354 F. 2d 608 (2d Cir. 1965), cert. denied *sub nom.*, Consolidated Edison Co. of New York, Inc. v. Scenic Hudson Preservation Conference, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966).

20. Consolo v. FMC, 383 U.S. 607, 620–621, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); Fibreboard Paper Prods. Corp. v. NLRB, 379 U.S. 203, 215–217, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964) ; FCC v. WOKO, Inc., 329 U.S. 223, 227–228, 67 S.Ct. 213, 91 L.Ed. 204 (1946) ; Philadelphia Television Broadcasting Co. v. FCC, 123 U.S. App.D.C. 298, 359 F.2d 282 (1966).

21. L. P. Steuart & Bro., Inc. v. Bowles, 322 U.S. 398, 406, 64 S.Ct. 1097, 88 L.Ed. 1350 (1944); Gonzalez v. Freeman, 118 U.S.App.D.C. 180, 186–187, 334 F.2d 570, 576–577 (1964).

event but only as an obligation to accompany the privilege of continuing to utilize a river subject to the jurisdiction of Congress. In general retrospective applications of law are not lightly inferred, but here the agency's actions were a reasonable exercise of its implied authority.

 Certainly we reject petitioner's argument that reversal is required because the agency arrogated to itself the powers of a court in equity. It is indeed a "familiar principle of equity * * * to regard as being done that which should have been done." [22] But the Commission did not suppose it had a broad equity charter. At most it referred to this principle as showing that its course was reasonable. The principles of equity are not to be isolated as a special province of the courts. They are rather to be welcomed as reflecting fundamental principles of justice that properly enlighten administrative agencies under law. The courts may not rightly treat administrative agencies as alien intruders poaching on the court's private preserves of justice.[23] Courts and agencies properly take cognizance of one another as sharing responsibility for achieving the necessities of control in an increasingly complex society without sacrifice of fundamental principles of fairness and justice.[24]

The Commission's actions were rooted in a reasonable effort to combine a sense of justice with practical common sense. Courts are loath to say that good sense is not good law.

Affirmed.

**22.** Central Maine Power Co. v. FPC, 345 F.2d 875, 876 (1st Cir. 1965).

**23.** United States v. Morgan, 307 U.S. 183, 191, 59 S.Ct. 795, 799, 83 L.Ed. 1211 (1939): "Neither body should repeat in this day the mistake made by the courts of law when equity was struggling for recognition as an ameliorating system of justice." *See also* Stone, *The Common Law in the United States*, 50 Harv. L. Rev. 4, 16–18 (1936).

**24.** *See* note 23, *supra;* Braniff Airways, Inc., v. CAB, —— U.S.App.D.C. ——, 379 F.2d 453 (No. 20160, Apr. 12, 1967); L. Jaffe, Judicial Control of Administrative Action vii (1965) (central thesis that "courts and agencies are in a *partnership* of lawmaking and law applying"); NLRB v. Warren Co., 350 U.S. 107, 112, 76 S.Ct. 185, 100 L.Ed. 96 (1955).