AMERICAN TRUCKING ASSOCIATIONS, INC., and Common Carrier Conference-Irregular Route, Petitioners,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.

No. 81–1602.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 5, 1982.
Decided Jan. 14, 1983.

Robert A. Hirsch and Robert R. Harris, Washington, D.C., with whom Nelson J. Cooney, Leonard A. Jaskiewicz and Edward J. Kiley, Washington, D.C., were on the brief, for petitioners.

Robert J. Grady, Washington, D.C., for respondents.

John Broadley, Gen. Counsel, Robert S. Burk, Deputy Gen. Counsel, and Cecelia E. Higgins, Atty., I.C.C., Robert B. Nicholson and Andrea Limmer, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents. Margaret G. Halpern, Atty., Dept. of Justice, and Kathleen M. Dollar, Atty., I.C.C., Washington, D.C., also entered appearances for respondents.

Before WILKEY, BORK and SCALIA, Circuit Judges.

Opinion for the Court filed by Circuit Judge SCALIA.

SCALIA, Circuit Judge:

This is a proceeding under 28 U.S.C. §§ 2321(a) and 2342(5) (1976) to enjoin or suspend an order of the Interstate Commerce Commission. Petitioners are associations of carriers who would be adversely affected by competition which the Order permits. At issue is the Commission's interpretation and enforcement of provisions of the Motor Carrier Act of 1980, Pub.L. No. 96–296, 94 Stat. 793 *et seq. (codified in* scattered sections of 49 U.S.C. (Supp. IV 1980)) (the "Act"), which exempt from some regulatory requirements owner-operators who carry certain agricultural commodities.

The Order that is challenged was promulgated on March 20, 1981 in the Commission's proceeding Ex Parte No. MC–143, *Owner-Operator Food Transportation,* 132 M.C.C. 521. This appeal was filed within 60 days, *see* 28 U.S.C. § 2344. The Commission has since rejected three successive motions for reconsideration by one or both of these Petitioners.*

■ To qualify as carriers, applicants generally must show that they are fit and that the transportation they offer is either required by public convenience and necessity, *see* 49 U.S.C. § 10922(a) (certificates for common carriage), or consistent with the public interest, *see* 49 U.S.C. § 10923(a) (permits for contract carriage). These showings need not be made, however, by applicants for

> transportation by motor vehicle of food and other edible products (including edible byproducts but excluding alcoholic beverages and drugs) intended for human consumption, agricultural limestone and other soil conditioners, and agricultural fertilizers if—
>
> > (i) such transportation is provided with the owner of the motor vehicle in such vehicle, except in emergency situations; and

(ii) after issuance of the [certificate or permit, certain annual tonnage limits are observed] and the owner of the motor vehicle certifies to the Commission annually that he is complying with the provisions of this clause and provides to the Commission such information and records as the Commission may require.

49 U.S.C. §§ 10922(b)(4)(E), 10923(b)(5)(A).

The Order at issue here adopts rules to implement this provision. Petitioners' principal complaint is the definition of "owner" which it prescribes—namely, "any person with an ownership interest of 10-percent or greater in the motor vehicle used to provide regulated transportation." 49 C.F.R. § 1138.2 (1981). We are asked to decide whether this is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1976). We conclude that it is not.

The first step in our analysis is to determine whether the term "owner" was used by Congress in a sense that was meant to refer to a well-established legal definition or series of legal precedents, in which case we should not defer to the agency's interpretation; or rather in a sense that was meant to be informed by the nature and purpose of the statutory scheme which the Commission is charged with elaborating. *See NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 120, 124, 64 S.Ct. 851, 855, 857, 88 L.Ed. 1170 (1944). We find the latter to be the case. The highly flexible nature of the term, and the subordination of rigid legalities to the *overall purpose of the provision* is amply demonstrated by the discussion in the House Report. Since this is the portion of the legislative history most extensively discussing the provisions at issue here, and since it is relevant for various purposes in this appeal, it bears reproduction in full:

---

* *Owner-Operator Food Transportation,* ICC Ex Parte No. MC–143 (unpublished order June 30, 1981), Jt. App. at 75; *id.* (Aug. 27, 1981), Jt. App. at 85; *id.* (Feb. 2, 1982), Jt.App. at 114. [Hereinafter cited as "June 30 Order," "Aug. 27 Order" and "Feb. 2 Order" respectively.] The third motion for reconsideration had initially

been rejected on procedural grounds by Commission staff. *See id.* (Sept. 28, 1981), Jt.App. at 101. The Administrative Procedure Act explicitly permits judicial appeal and request for agency reconsideration to be pursued simultaneously. 5 U.S.C. § 704 (1976).

The intent of this provision is to allow the individual who owns and operates his or her own truck to haul processed foods, soil conditioners, and fertilizers with a minimum of Federal regulation. In order to assure that this provision was limited to independent owner-operators, the Committee considered adding language to the bill stating that the "sole" owner must be in the vehicle. The Committee decided that it was not necessary to add this language since it believed the intent of the provision was already clear. In addition, the Committee was concerned that the term "sole owner" might be interpreted in an unduly restrictive manner. For example, it is not the Committee's intent to preclude an independent owner-operator from obtaining a certificate under this provision simply because the vehicle might be jointly owned by the owner-operator and his or her spouse or other family member. In addition, there was concern that the term "sole owner" might be interpreted to prohibit the issuance of a certificate to an owner-operator who is financing his vehicle on the grounds that the bank or other lending institution is the real owner. This is clearly not the Committee's intent. The Committee also wants to make it clear that an independent owner-operator who, for legitimate business reasons, sets up a partnership or family-type corporation would still be able to obtain a certificate under this provision. The Commission is urged, however, to monitor this closely to assure that sham corporations are not set up in an attempt to circumvent the intent of this provision. Furthermore, the Committee wants to note that it does not believe that the limitations with respect to this provision are unduly restrictive. The small businessman or the independent owner-operator who wants to expand his or her business can do so under the liberalized entry provisions in new section 10922(b)(1) of title 49, United States Code. The fitness-only provision for processed foods and fertilizers is intended to help the individual who owns and operates his own vehicle.

H.R.Rep. No. 96–1069, 96th Cong., 2d Sess. 16–17, *reprinted in* 1980 U.S.Code Cong. & Ad.News 2283, 2298–99 (the "House Report"). The lack of such well-defined legal content in the word "owner" as would preclude deference to administrative interpretation is further demonstrated by the following statement on the Senate floor by Senator Packwood, one of the sponsors of the Act, in an exchange with Senator Cannon, the floor manager, and with which the latter apparently agreed:

> One final thing. I am concerned about the independent owner-operator section relating to transportation of processed foods. I can see from the House report that there is no intention that that section be read narrowly. For example, if a truck is owned by a husband and wife, either should be allowed to drive the truck, or if a partner owns a significant interest in the truck, that person should be able to drive the vehicle.

126 Cong.Rec. S7686 (daily ed. June 20, 1980). Our task, then, is to determine whether the Commission's interpretation of the word "owner" is so unreasonable as to go beyond the bounds of interpretive discretion which Congress evidently afforded.

### THE QUANTITATIVE TEST

Petitioners argue, first of all, that any purely quantitative definition of owner is forbidden. We disagree. It seems to us that a quantitative interest in the value of the truck is the only element that the concept of ownership *necessarily* embraces—so that, for example, one who holds title entirely as trustee for another would not qualify. This quantitative aspect of ownership is the only element which the legislative history explicitly addresses—in the House Report's rejection of the limitation to "sole owner," and in the floor debate's assumption that a partner should be able to drive a qualifying vehicle only if he "owns a significant interest" in it.

Petitioners assert, however, that the word "owner" should, so to speak, be made to carry other freight as well. They favor "a qualitative standard of ownership," Peti-

tioners' Reply Brief at 4 n. 1, which will make the definition the vehicle for avoiding the "sham" transactions which the House Report darkly (in more senses than one) alludes to, Petitioners' Brief at 10 n. 9. This may be *possible* (though Petitioners have not clearly told us how) but we are not persuaded that it is reasonably necessary, which is the burden Petitioners must bear. To the extent that the Commission must take into account express or implied legislative policies other than the insistence upon some quantitative financial interest in the vehicle, we see no reason why this definition is the required, or even a particularly natural, means.

This is especially so since loading all "sham"-avoidance onto the qualifying definition would have the effect of complicating and prolonging the authorization process. Petitioner American Trucking Associations acknowledged—indeed argued—before the Commission that its qualitative approach, which does not "[look] to the form rather than substance of the operator's relationship with his equipment," requires "a case-by-case analysis." ATA Petition for Reconsideration in Ex Parte No. MC–143 at 3, Jt.App. at 68. While it asserted that this case-by-case approach "provides the only mechanism by which the Congressional objectives can be met," *id.,* we do not think so. "Shams" unrelated to the requisite quantitative interest may well be detected and avoided by a system of spot checks or audits, instead of a requirement that impedes or prevents initial authorization.

We cannot say that the Commission has been arbitrary in finding its approach more compatible with the purpose of the pertinent Motor Carrier Act provisions applicable to owner-operators. The House Report (in a portion not set forth above), says that this purpose is to "ease the way for them to get operating authority." House Report at 10. Policing and enforcement arrangements that would complicate the authorization process are disfavored, as exemplified by the statute's specific requirement that the Commission "streamline and simplify, to the maximum extent practicable, the process for issuance of certificates [permits] to which [the owner-operator provisions here under discussion] apply." 49 U.S.C. §§ 10922(b)(6), 10923(b)(5)(B). In the Senate floor debate, Senator Cannon stated that the Commission "must bend over backwards to simplify procedures for those applying" for the agricultural commodities authority. 126 Cong.Rec. S7685 (daily ed. June 20, 1980). Given all this, we cannot find the Commission to have been unreasonable in declining to include within the definition of "owner" more than the possession of a quantitative financial interest which the word necessarily requires.

### THE 10% FIGURE

Even though the quantitative approach is permissible, the Commission's rule must still fall if the specific quantity selected is "arbitrary" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Here, Petitioners assert that the Commission is condemned out of its own mouth, since in its second denial of reconsideration it acknowledged that "[t]o some degree, of course, the [10%] figure—indeed, any figure—is arbitrary." June 30 Order at 4, Jt.App. at 78. This is playing with words. The arbitrariness which the APA proscribes is the failure to draw reasoned distinctions where reasoned distinctions are required. If, for example, the Federal Communications Commission should choose to implement its recently conferred statutory authority to award initial broadcast licenses on the basis of "random selection" from among qualified applicants, Omnibus Budget Reconsideration Act of 1981, Pub.L. No. 97–35, 95 Stat. 357, 736, *codified at* 47 U.S.C.A. § 309(i)(1) (Supp.1982), it would not violate the APA. The fair meaning of the Commission's statement is that, in the nature of things, one cannot give (and therefore cannot be required to give) a reason for selecting 10% instead of, say, 12½% or perhaps even 15% as the required ownership interest. It accords with common usage (and perhaps with reality) to call the choice to that extent "arbitrary"—though the APA would prefer to describe it as

"committed to agency discretion by law," 5 U.S.C. § 701(a)(2). We decline to penalize the Commission for its refreshingly ingenuous use of the vernacular, provocative though it may have been.

Nonetheless, even conceding the existence of a few percentage points of unaccountable discretion, the Commission must at least justify its selection of 10% as opposed to substantially higher or lower figures—for example, the 25% urged by Commissioner Clapp. *See* 132 M.C.C. at 531. We believe it has done so. On the face of the matter, an interest much *below* 10% (though that is not what these Petitioners urge) would be hard to square with the notion of "significant interest" which the Commission insisted upon, see Notice of Proposed Rulemaking, 45 Fed.Reg. 61338 (1980)—and which, by reason of the legislative history discussed above, it was permitted if not compelled to insist upon. As to its reason for not selecting substantially higher percentage figures, this appears in the statement contained in its Order that "[t]he 10-percent figure will permit easier entry to the owner-operators sector by limiting the individual capital expenditure necessary to enter the trucking business." 132 M.C.C. at 525. The same basis is set forth in the first denial of reconsideration, which asserted the Commission's belief that "the 10-percent standard ownership is ... consistent with our mandate to encourage new entrants into the owner-operators sector," and would "allow several persons to form a legitimate partnership or small corporation to divide the high cost of motor vehicle equipment and maintenance," June 30 Order at 4, 5; Jt.App. at 78, 79. In other words, the Commission evidently selected the lowest percentage which it viewed as compatible with the "significant interest". requirement in order to facilitate entry into this deregulated field. That objective is certainly in accord with the purposes of the Motor Carrier Act "to reduce unnecessary regulation," Act § 2, 94 Stat. at 793, and to enhance "opportunities ... to enter the trucking industry," Act § 3(a), 94 Stat. at 793. While nothing in either the text or legislative history of the agricultural com-

modities provisions in particular suggests that these purposes were to be pursued through the definition of owner, nothing prevents it either.

Petitioners place great reliance upon the passage in the House Report, quoted above, which states that "the Committee ... does not believe that the limitations with respect to this provision are unduly restrictive," since "[t]he small businessman or the independent owner-operator who wants to expand his or her business can do so under the liberalized entry provisions" that are generally applicable, and that the agricultural commodities provisions are intended to help "the individual who owns and operates his own vehicle." House Report at 17, U.S. Code Cong. & Admin.News, 1980, p. 2299. But all this establishes is the congressional belief that the provision will not enable every small businessman or even every owner-operator to broaden his business to the extent that the general entry provisions permit. The "owner-in-the-vehicle" requirement of subparagraph (i) and the annual tonnage ceiling of subparagraph (ii) amply explain that belief. It seems to us very likely that those are precisely the "limitations" the statement had in mind—but the Commission is in any event well within the bounds of its discretion in taking action consistent with such a conclusion.

Since we cannot say either (a) that the selection of the 10% figure has no reasonable bearing upon the objective that the Commission assigned, or (b) that the objective itself is impermissible, we must let the Commission's action stand.

## THE MULTIPLE–VEHICLE RULE

Finally, in connection with this aspect of the appeal, we come to Petitioners' assertion that—whatever criterion or percentage requirement of ownership might be adopted—no trucker can be permitted to qualify as the owner of more than one truck, as the Commission's Order would allow. Petitioners point out, correctly we believe, that the Commission has been unable to cite "any statement by Congress, either in the statute

or in the legislative history, which would demonstrate that owners of more than one vehicle were intended to qualify for processed foods authority." Petitioners' Brief at 11. We do not understand the Commission to assert, however, that its interpretation is compelled; only that it is permissible and (for essentially the same acceptable reasons that underlay its selection of the 10% interest figure) desirable. The burden is on Petitioners, then, to demonstrate a congressional intent to the contrary, and we do not believe they have done so.

In addition to the portion of legislative history discussed in the preceding section (whose application to the present point must be rejected for the same reasons there assigned) Petitioners point out that the statutory language requires that the transportation be provided "with the owner of *the motor vehicle* in such vehicle." 49 U.S.C. §§ 10922(b)(4)(E)(i) and 10923(b)(5)(A)(i) (emphasis added). They argue that the use of the singular requires that the provision be given the meaning they suggest. We find the argument unpersuasive because (1) 1 U.S.C. § 1 (1976) provides that "[i]n determining the meaning of any Act of Congress, ... words importing the singular [number may extend and be applied] to several persons, parties, or things"; (2) even if ownership of multiple vehicles had been specifically in Congress's mind, the structure of the sentence in question would still have required use of the singular; and (3) there is no more reason why the use of the singular noun "vehicle" should disqualify a person owning more than one vehicle than the use of the singular noun "owner" three words earlier should disqualify (as it clearly does not) a vehicle owned by more than one person.

We find, therefore, that the Commission's actions in adopting an exclusively quantitative test of ownership, in establishing 10% as the requisite interest standard, and in permitting ownership of multiple vehicles, are not arbitrary, capricious, an abuse of discretion or contrary to law. We might take a different view of the matter if the combined effect of these decisions were to open up the agricultural commodities exemption to capital-intensive "big business" instead of to individuals profiting from the provision of their own labor, whom Congress evidently had in mind. We have no such fears. There is less to the Commission's action than meets the eye. It has not created the risk which Petitioners describe that "an infinite number of individuals [will] coalesce in partnership or corporate form in order to circumvent the general licensing standards." Petitioners' Reply Brief at 10. As we compute it, the combination of the 10% interest requirement and the multiple-vehicle permission will enable no more than ten individuals to "coalesce" in an arrangement that will enable any of them to drive any of ten trucks. Their competitive powers, moreover, are not increased tenfold over what they would be if each of the ten were permitted a qualifying interest in only a single truck. The crucial limiting factor, which is unaffected, is that one of the owner-operators must be "in [the] vehicle" for the operating exemption to apply. Thus, a hypothetical owner-operator who constantly drives (or sleeps in the cab of) a hypothetical truck that never requires repair or servicing would not find his earning potential increased at all by the multiple-vehicle aspect of the Commission's rule. For a real-life trucker, we do not know what the increase will be, but it will leave him and his nine associates with market power somewhat short of that of a major corporation. The main effect of the rule is to enable them to provide their labor more efficiently.

THE MONITORING PROGRAM

We turn last, and very briefly, to that portion of the Petitioners' Brief (at 12–20) entitled "The Commission's Purported Monitoring Program Emasculates 'Owner' As A Statutory Prerequisite," and the corresponding portion of their Reply Brief (at 10–16) entitled "The Commission Has Failed to Demonstrate That Its Purported Monitoring Program Is Consistent With Or Carries Out Congressional Intent." As noted earlier, we have jurisdiction over this appeal under the provisions of 28 U.S.C.

§§ 2342(5) and 2344, which permit us to entertain "a proceeding to enjoin or suspend, in whole or in part, a rule, regulation, or order of the Interstate Commerce Commission," 28 U.S.C. § 2321(a). The rule challenged here adopted some provisions that can be considered relevant to the Commission's monitoring of compliance with the agricultural commodities provisions of the law—notably, specification of the form and content of the annual reports to be filed by carriers under 49 U.S.C. § 11145(c), and of the tariff filings to be made under 49 U.S.C. §§ 10762(a)(1) and 10762(g). To the extent that Petitioner merely seeks to challenge the validity of these provisions in and of themselves, we find nothing in them that the law proscribes, and nothing omitted that the law requires.

As the titles of these portions of Petitioners' briefs suggest, however, the attempted appeal seeks to go beyond this. It requests a determination that the overall scheme of monitoring that the Commission has put in place—the combined effect of not only the interpretations and filing requirements adopted by the present order but also the application form earlier adopted and all other activities which might serve to remedy any monitoring difficulties those provisions create—is unlawfully inadequate. The jurisdictional provisions cited above do not authorize us to conduct such an inquiry, which would not be "a proceeding to enjoin or suspend ... a rule, regulation, or order of the Interstate Commerce Commission," 28 U.S.C. § 2321(a).

It is true that Petitioners complained about overall monitoring difficulties in the course of the rulemaking proceedings, and that to assuage their concerns the Commission stated in its order that it had "every intention of complying with [the] directive [of the House Report] ... to monitor," 132 M.C.C. at 526. This assurance was repeated in the first denial of reconsideration, June 30 Order at 4, Jt.App. at 78; and the third denial of reconsideration discussed monitoring efforts and capabilities at some length, Feb. 2 Order at 2–4, Jt.App. at 115–17. But raising the issue of adequacy of enforcement in a rulemaking proceeding, and addressing it in the statement of basis and purpose accompanying adoption of the rule or in the denial of petition for reconsideration, does not convert that issue into a "rule, regulation, or order." Any relief to which Petitioners are entitled with regard to that complaint must be sought, not in courts of appeals under the special provisions for review of certain ICC action, but in district courts under the so-called nonstatutory review provision of the Administrative Procedure Act, 5 U.S.C. § 703 (second sentence). Lest we appear to be encouraging such action, rather than merely pointing out its availability, we note that in designing the most appropriate means to enforce the law, agency discretion is at its zenith and judicial power at its nadir. *See Niagara Mohawk Power Corp. v. FPC,* 379 F.2d 153, 159 (D.C.Cir.1967).

*Petition dismissed.*