939 F.2d 1057
 291 U.S.App.D.C. 229, 1991-2 Trade Cases 69,576
 ENVIRONMENTAL ACTION, INC., Salt Lake Community Action
Program, Salt Lake Citizens Congress, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
PacifiCorp, Utah Associated Municipal Power Systems, Utah
Division of Public Utilities, Council of Industrial Boiler
Owners, Ad Hoc Committee for a Competitive Electric Supply
System, Idaho Power Company, Public Service Commission of
Wyoming, Washington City, Utah, Public Utility Commission of
Oregon, American Iron and Steel Institute, American Paper
Institute, Inc., Intervenors.
 Nos. 89-1333, 89-1338 and 89-1343.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 16, 1990.
Decided Aug. 2, 1991.
 
 Petitions for Review of Orders of the Federal Energy Regulatory Commission.
 Daniel C. Kaufman, with whom Kenneth G. Hurwitz was on the brief, for petitioners Nucor Steel Div. of Nucor Corp. and Public Utilities Authority for the Town of Plymouth, Utah, in 89-1338 and 89-1343.
 Scott Hempling for petitioners Environmental Action, Salt Lake Community Action Program and Salt Lake Citizens Congress in 89-1333.
 Samuel Soopper, Atty., F.E.R.C., with whom William S. Scherman, Gen. Counsel, Jerome M. Feit, Sol., and Katherine Waldbauer, Atty., F.E.R.C., were on the brief, for respondent in 89-1333, 89-1338, and 89-1343.
 William F. Young, with whom Robert W. Johnson, Arnold H. Quint, George M. Galloway, and Helen J. Edwards for PacifiCorp, Michael S. Gilmore, for Idaho Public Utilities Com'n, Michael Ginsberg, for Utah Div. of Public Utilities, W. Benny Won, for Oregon Dept. of Justice, and Roger C. Fransen and Milo M. Vukelich, for Wyoming Atty. General's Office, were on the joint brief, for intervenors PacifiCorp, et al., in all cases.
 Earl H. O'Donnell, Robert F. Shapiro, and Lynn N. Hargis were on the brief for intervenor American Paper Institute, Inc., et al., in 89-1333, 89-1338, and 89-1343. Jan B. Vlcek also entered an appearance for intervenor.
 Richard M. Sharp and Timothy K. Shuba were on the brief for intervenor Utah Associated Mun. Power Systems in all cases.
 Roger C. Fran entered an appearance for intervenor, Public Service Com'n of Wyoming.
 Kenneth G. Kieffer entered an appearance for intervenor, Public Power Counsel.
 Sheryl S. Hendrickson, Charles M. Darling, IV, J. Patrick Berry and Drew J. Fossum entered appearances for intervenor, MAGCORP of America, Inc.
 Brian R. Gish entered an appearance for intervenor, Idaho Power Co.
 W. Benny Won entered an appearance for intervenor, Public Utilities Com'n of Oregon.
 Before EDWARDS, D.H. GINSBURG, and SENTELLE, Circuit Judges.
 Opinion for the Court filed by Circuit Judge D.H. GINSBURG.
 D.H. GINSBURG, Circuit Judge:
 
 
 1
 Several petitioners for review question whether the Federal Energy Regulatory Commission properly exercised its discretion under Sec. 203 of the Federal Power Act, 16 U.S.C. Sec. 824b, when it approved and set conditions for a merger between two companies that generate, sell, and transport electric power in the western states. The conditions require the merged company, upon request, to transmit (or "wheel," in the trade) power for other utilities. The petitioners maintain that the conditions are inadequate fully and fairly to remedy the anticompetitive effects of the merger.
 
 I. BACKGROUND
 
 2
 In October 1988, the Commission approved the proposed merger of Utah Power and Light Co. and PacifiCorp Maine d/b/a Pacific Power and Light Co. into a combined entity that was subsequently renamed PacifiCorp. Utah Power and Light Co., 45 FERC p 61,095 (1988) (Opinion No. 318 ). Prior to the merger, UP & L had generated and sold, at both wholesale and retail, electricity in Utah and in southeastern Idaho and southwestern Wyoming. PP & L had generated and sold electricity, also at both wholesale and retail, in California, Idaho, Montana, Oregon, Washington, and Wyoming. Both companies owned extensive interstate transmission networks extending throughout their respective areas of business. Their merger was designed to achieve certain economies of scale and to take advantage of the complementary nature of the two companies' peak demand periods. (UP & L's demand peaked in the summer, PP & L's in the winter.)
 
 
 3
 When considering the merger application, the Commission's primary concern was with the possible anticompetitive effect of the merger in the bulk energy sales and transmission markets in the contiguous states west of the Rockies. Power is in surplus in the Northwest, while the Southwest and Rocky Mountain areas are energy-poor. The merger unites in PacifiCorp control of one of the two main transmission paths into the Southwest and 88.2 percent of the transmission capacity into the Rocky Mountain area.
 
 The Commission found that
 
 4
 prior to the merger (even without the additional transmission control that would result from the merger) UP & L's transmission system constitutes an essential facility since: (1) UP & L's system is controlled by a monopolist; (2) competitors are unable to economically duplicate it; (3) its use has been denied to competitors; and (4) it is feasible to make the facilities available to competitors.
 
 
 5
 * * * * * *
 
 
 6
 Following the merger, [PacifiCorp] would control the essential facilities previously owned by UP & L, as well as PP & L's transmission facilities. As a result, [PacifiCorp] would have enhanced ability to exercise monopoly power over transmission in the relevant geographic markets. This increased control of transmission between the Northwest and the Southwest, as well as the Rocky Mountain area, enhances the merged company's ability to foreclose competition for sales of bulk power.
 
 
 7
 Opinion No. 318, 45 FERC at 61,287-88. More specifically, the agency foresaw two distinct types of competitive harm from the merger, monopsony and monopoly:
 
 
 8
 First, by refusing to wheel low-cost power from the Northwest, the merged company could instead buy the power, and, in reselling [a/k/a brokering] it, extract [monopsony] profits. Second, the merged company could give preference to its own generation over that of competitors for sales into [monopolized] southwestern markets (even when the latter is cheaper).
 
 
 9
 Id. at 61,288.
 
 
 10
 Accordingly, the Commission found, in terms echoing those of Section 7 of the Clayton Act, 15 U.S.C. Sec. 18, that "the proposed merger is likely to result in a substantial lessening of competition in the relevant product and geographic markets." Id. at 61,284. The agency therefore attached to its approval of the merger a number of conditions "designed to provide a long-term remedy to [its] likely anticompetitive effects." Id. at 61,290.
 
 
 11
 First, PacifiCorp must provide firm (i.e., uninterruptible) wholesale transmission service at cost-based rates to any "utility" that requests it. For present purposes, the significant aspect of this condition is that small power producers and cogenerators--so-called Qualifying Facilities (QFs in the parlance of the Public Utility Regulatory Policies Act (PURPA), 16 U.S.C. Sec. 824a-3)--are excluded from the definition of "utility." Second, for a period of five years a percentage of the company's transmission capacity must be reserved for use by so-called Transmission Dependent Utilities (TDUs), which are dependent upon PacifiCorp's transmission lines for access either to their sources of power or to their retail customers. Here the significant point is that only a TDU in existence as of the date of the merger application is eligible to use this reserved capacity. Third, if PacifiCorp chooses to provide a non-firm (i.e., interruptible) transmission service, then the maximum rate it may charge must be based upon "an equal three-way sharing of benefits" among the energy buyer, the energy seller, and PacifiCorp as the transmitting entity. (The benefit to be divided is the difference between the energy buyer's decremental cost and the seller's incremental cost.) Opinion No. 318, 45 FERC at 61,290, 61,295. PacifiCorp accepted these conditions.
 
 
 12
 A multitude of intervenors, including citizens groups, labor unions, industrial end users, and competing energy producers requested rehearing, and in Opinion No. 318-A, 47 FERC p 61,209 (1989), the Commission rejected their various arguments for changing the conditions. In particular, it declined to drop its exclusion of QFs from the group of utilities entitled to wholesale transmission service from PacifiCorp. Without such transmission access, a QF may, by reason of the PURPA, force its native (i.e., local) utility to purchase its power. 18 C.F.R. Sec. 292.303. With transmission access over PacifiCorp's system, a QF could also force a distant utility to buy its power, which the FERC deemed an unfair advantage over competing sellers. The Commission similarly stood fast against the request of Nucor Steel, an industrial end user served by UP & L before the merger (though now served by a newly formed municipal utility), that PacifiCorp be required to transmit power for retail customers, such as itself.
 
 
 13
 In both Opinion No. 318-A and in a further supplemental opinion, No. 318-B, 48 FERC p 61,035 (1989), the Commission also refused to extend TDU status to utilities that did not exist as of the date of the merger application, expressing special concern for existing TDUs, which "had been competitively disadvantaged in the past," and fear that extending their access remedy to others "would dilute or negate the effectiveness of the short-term [i.e., five-year] conditions." Opinion No. 318-B, 48 FERC at 61,181-82. Finally, the Commission refused the request of the United Mine Workers of America and several citizens groups that it require PacifiCorp to provide non-firm transmission service, stating that "[o]n this record, we are not willing to conclude that the merged company will be able to exercise market power in the non-firm market on a sustained basis." Opinion No. 318-A, 47 FERC at 61,738. Various parties filed petitions for review, now consolidated, in this court.
 
 
 14
 Petitioner Nucor, as an end user, is denied transmission rights over PacifiCorp's facilities and hence is unable to gain direct access to competitive sources of energy from the Northwest. Petitioner Public Utilities Authority for the Town of Plymouth, Utah, the newly created municipal utility serving Nucor, is included in the basic wheeling requirement, but is not entitled to the especially favorable access conditions for TDUs during the five-year period because it was formed after the date of the merger application. Both petitioners, as purchasers of power, face potentially higher prices for energy and transmission service because QFs are limited in their access to the market and because of the alleged lack of a competitive market for non-firm transmission.*
 
 
 15
 We set aside a decision of the FERC only if it is arbitrary and capricious or otherwise contrary to law. Michigan Consolidated Gas Co. v. FERC, 883 F.2d 117, 120-21 (D.C.Cir.1989) (MichCon ). The law relevant here is Sec. 203 of the Federal Power Act, which provides that the FERC may approve a merger only if it "will be consistent with the public interest." The parties seem to agree that for the purposes of this case the relevant "public interest" includes both the preservation of economic competition, as expressed in the antitrust laws of general application, see Gulf States Utilities Co. v. FPC, 411 U.S. 747, 758-60, 93 S.Ct. 1870, 1877-78, 36 L.Ed.2d 635 (1973), and the various policies reflected in the statutes specific to energy regulation. See American Paper Institute v. American Electric Power Service Corp., 461 U.S. 402, 417, 103 S.Ct. 1921, 1930, 76 L.Ed.2d 22 (1983) (API ).
 
 II. ACCESS TO FIRM TRANSMISSION
 
 16
 The Commission required the merged company to wheel power for "utilities" in order to prevent PacifiCorp from using its bottleneck facilities to keep its customers from dealing with any low-priced supplier that might seek to compete with it. The petitioners argue that the Commission's rationale extends equally to requiring PacifiCorp to provide firm transmission service at the instance of QFs and of end users.
 
 A. Exclusion of Qualifying Facilities
 
 17
 The petitioners argue that the exclusion of QFs from the benefit of mandatory wheeling is not based upon a reasoned analysis, renders the condition inadequate to counter the anticompetitive effects of the merger, and is an undue discrimination under Sec. 205(b) of the FPA. 16 U.S.C. Sec. 824d(b). The FERC's initial decision merely announced the exclusion of QFs, without explanation. Yet, on rehearing the Commission offered at least five distinct reasons for the exclusion. It defends only three of them before this court.
 
 
 18
 The Commission's first argument is that affording QFs mandatory transmission access would give them an unwarranted competitive preference by enabling them to force utilities other than their native utility to buy their power. This simply misconceives the purpose of antitrust policy, which is not to make competitors equal, or to avoid all forms of advantage; the antitrust laws are for "the protection of competition, not competitors." Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962). Competition is valued not for its own sake but because it is most likely to maximize the satisfaction of consumer wants. Had the FERC looked to the interests of consumers, rather than those of competitors, it would have gone a long way toward avoiding any error in its antitrust analysis.
 
 
 19
 Monopoly control over an essential pathway into the western energy market threatens to prevent all competition; the advantage that a QF may have, owing to its statutory right to force a purchaser to buy its power, does not threaten to prevent any competition. A QF may force a sale only at the purchasing utility's avoided cost. 16 U.S.C. Sec. 824a-3(d) ("the cost to the electric utility of the electric energy which, but for the purchase from such [QF], such utility would generate or purchase from another source"). If the QF is less efficient (i.e., has higher costs) than its competitors, its guaranteed ability to sell power only at a price below its cost will not cause its competitors any loss of sleep. If, on the other hand, the QF is more efficient, then the preference it receives is not a threat to, but only a redundant (legal) guarantee of, the competitive (economic) outcome. In fact, the principal effect of the preference seems to be to ensure that large power producers do not discriminate against QFs. FERC v. Mississippi, 456 U.S. 742, 750, 102 S.Ct. 2126, 2132, 72 L.Ed.2d 532 (1982) (prior to the PURPA "traditional electricity utilities were reluctant to purchase power from, and to sell power to, the nontraditional facilities").
 
 
 20
 In any event, such advantage as a QF may have stems directly from the Congress's policy choice to encourage the sale of power by QFs rather than by traditional utilities. See API, 461 U.S. at 417, 103 S.Ct. at 1930 ("basic purpose of Sec. 210 of PURPA was to increase the utilization of cogeneration and small power production facilities and to reduce reliance on fossil fuels"). The Commission's effort to place QFs "on an essentially equal competitive footing with competing suppliers," Opinion No. 318-A, 47 FERC at 61,740, by giving such suppliers the access it denies to QFs would effect an administrative repeal of this congressional choice; by definition, this is not in the public interest. Put otherwise, the PURPA establishes a specific public interest in encouraging QFs by giving them certain rights. This interest may or may not be wholly consistent with the antitrust laws, but being specifically relevant to this case it deserves at least as much consideration as the general interests embodied in the antitrust laws; yet the FERC failed to give it any weight.
 
 
 21
 The Commission's second argument--that QF access is not needed in order "to mitigate PacifiCorp's market power" and QFs are "not ordinary competitors of utilities and are not going to suffer the same harm as other competitors" because they have a guaranteed market for their power--makes no sense from the consumer welfare point of view reflected in the antitrust laws. If the merged company may refuse to wheel the QFs' power, or may charge higher than cost rates, then it may extract a monopoly profit by virtue of the transmission bottleneck arising from the merger. In other words, the ability to prevent lower priced competitors from reaching the market confers the power to charge consumers monopoly prices.
 
 
 22
 Even if we were to evaluate the situation, as did the FERC, from the perspective of the QFs rather than from that of their potential customers, we would conclude that the Commission fails to justify their exclusion. The Commission points out in its brief that PacifiCorp "must, like any other electric utility, buy power from a QF up to its avoided cost," but that is hardly an answer; a QF's sale to PacifiCorp only results in the type of brokering that the Commission condemns as the monopsony problem with the merger. PacifiCorp can buy the QF's power and then sell its own power to a distant purchaser with a higher decremental cost. In this way PacifiCorp can capture for itself the difference between the price it pays the QF and the distant market resale price while confining the QF to the price available in its local market (viz., PacifiCorp's avoided cost).
 
 
 23
 Finally, the Commission asserts that "factual differences" between QFs and other competitors justify their disparate treatment. If there are rational reasons for treating QFs differently, then the discrimination is not "undue" within the meaning of Sec. 205(b) of the FPA. 16 U.S.C. Sec. 824d(b). The FERC fails, however, to identify any distinguishing feature other than the QFs' statutory preference under PURPA. But this "factual difference" is subsumed in the prior discussion; the FERC cannot turn a losing argument into a winner just by giving it a new name and trying it a second time.
 
 B. Exclusion of End Users
 
 24
 The petitioners next argue that the FERC's refusal to give end users the right to import power over PacifiCorp's transmission system is inconsistent with the public interest. End users, say the petitioners, are as much at the mercy of the merged company's monopoly power as are utilities, which purchase for resale, and they are thus equally in need of protection.
 
 
 25
 The Commission's entire analysis of this matter consists of a brief footnote in which it gives two reasons for denying end users access to PacifiCorp's transmission facilities:
 
 
 26
 [I]t was not the intention in Opinion No. 318 to establish a method by which retail customers of either PP & L or UP & L could bypass their native utility. We take this opportunity to expressly deny the request of Nucor Steel to expand the applicability of the transmission conditions to "power intensive end-users, such as Nucor, taking service from the applicants' transmission facilities." ... To do so could jeopardize the recovery of the investment the merged company made to serve those customers. Moreover, whether to allow a retail customer the right to purchase from a utility outside the customer's service territory lies within the province of the state regulatory commission that has jurisdiction over the rates to be charged to that retail customer.
 
 
 27
 47 FERC at 61,739 n. 49. The Commission's first reason, the possible non-recovery of PacifiCorp's investment, is unsupported by analysis or evidence, substantial or otherwise. While it is reasonably inferable that an end user able to by-pass PacifiCorp in the purchase of power could force PacifiCorp's price down to the marginal cost of the end user's alternative source, it simply does not follow that PacifiCorp would be unable to earn an appropriate return on its investment; in fact, so far as the record reveals, PacifiCorp could be the low cost provider, in which case it would lose no sales and an indeterminate (and therefore possibly insignificant) amount of profit. Additionally, both of the Commission's reasons appear to be inconsistent with the position it has taken under the Natural Gas Act in the comparable situation involving end users by-passing a local distribution company. See MichCon, 883 F.2d at 121-23. Without more support, and a distinction that justifies the seemingly different approaches that the FERC has taken under two very similar statutes, we cannot accept this footnote in full discharge of the agency's obligation to make a reasoned decision.
 
 
 28
 The Commission's last argument, made in its brief to this court, though not in the opinions below, is that facilitating end users' by-pass does not respond to any harm caused by the increase in monopoly power brought about by the merger: it involves "a separate market that has not been found to be harmed by the merger." The point may be well taken, but the Commission did not make it in the opinions below, and therefore we do not consider it on appeal. See SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). But cf. FLRA v. Department of Treasury, Fin. Mgt. Serv., 884 F.2d 1446, 1455 (D.C.Cir.1989) (accepting subsequent explanation because facts present "no risk that counsel may have acted as 'mavericks disembodied from the agency that they represent' ") (quoting Church of Scientology of California v. IRS, 792 F.2d 153, 165 (D.C.Cir.1986) (en banc) (Silberman, J., concurring)).
 
 C. Exclusion of New and Potential TDUs
 
 29
 The petitioners object to the Commission's refusal to give TDU status to utilities formed after the date of the merger application, arguing that "[t]he Commission's proper function under Section 203 is to interpose such protections in the future as will advance antitrust policy in the future, not to dole out special benefits to those specific competitors who may have suffered [antitrust] harm in the past." The FERC did note that only TDUs already in existence "suffer the harm and we must allow them to secure the remedy." But it added immediately thereafter: "If current native load customers of the company could form new municipal or cooperative utilities in order to gain transmission access"--as petitioners here have done--"that would dilute or negate the effectiveness of the short-term conditions." Opinion No. 318-A, 47 FERC at 61,746.
 
 
 30
 This is especially true because [Remaining Existing Capacity] may not be available in any large volume on critical parts of the merged company's transmission system. Dividing it among more participants lessens the capacity each one will receive in the allocation. We believe that limiting the number of municipal utilities represents the better course to follow and we have exercised our discretion accordingly.
 
 
 31
 Id.
 
 
 32
 Although the agency's position comes perilously close to giving special compensation for past harms (which even the FERC concedes would be inappropriate), it is also part of a forward-looking effort to avoid providing an additional, purely regulatory inducement for the creation of municipally owned utilities. The limitation is therefore within the Commission's discretion. Niagara Mohawk Power Corp. v. FPC, 379 F.2d 153, 159 (D.C.Cir.1967) ("agency discretion is, if anything, at zenith when the action assailed relates ... to the fashioning of policies, remedies and sanctions").
 
 III. NON-FIRM TRANSMISSION CONDITIONS
 
 33
 Turning to a different aspect of the conditions, the petitioners claim that the FERC's failure to require PacifiCorp to wheel non-firm power allows the merged company to exercise monopoly control in the non-firm energy "submarket" of the western bulk energy market. They further object that the Commission's authorization of voluntary non-firm transmission rates based upon "an equal three-way sharing of the benefits" from the transaction allows PacifiCorp to recover more than the cost of transmission and thus to reap monopoly profits.
 
 
 34
 The FERC argues that "the conditions it did impose [with respect to firm transmission service also] made it likely that non-firm transmission across PacifiCorp's system would be available on a regular basis." It reasons that PacifiCorp's obligation to provide wheeling service and a purchaser's right to reassign capacity on a firm or non-firm basis, Opinion No. 318, 45 FERC at 61,295; Opinion No. 318-A, 47 FERC at 61,738, will combine to bring into the market many new participants with the ability to sell non-firm service in competition with PacifiCorp. As a practical matter, we are told, any utility with a firm contract can compete in the non-firm market because inevitable fluctuations in the utility's load create excess capacity that can be resold on a non-firm basis.
 
 
 35
 Although the petitioners argue that the availability of excess firm capacity to be used for non-firm service is "a matter of speculation," the Commission's economic prediction to the contrary seems eminently reasonable. Nucor's own prediction--that the lack of guaranteed non-firm access will cause customers to oversubscribe for firm transmission in order to be guaranteed of meeting their maximum load transmission needs--tends only to corroborate the Commission's forecast of a competitive market in excess non-firm transmission capacity.
 
 
 36
 Even if the parties' predictions regarding the emergence of a non-firm market were more clearly incompatible at the theoretical level, it is within the scope of the agency's expertise to make such a prediction about the market it regulates, and a reasonable prediction deserves our deference notwithstanding that there might also be another reasonable view. MichCon, 883 F.2d at 124. Should the evidence later demonstrate that a competitive market in non-firm transmission failed to materialize, and that as a result the merged company gained considerable power in the non-firm market, the petitioners may then seek appropriate relief from the Commission, as they might based upon a change in circumstances.
 
 
 37
 PacifiCorp's alleged ability to reap monopoly profits from three-way split pricing is wholly dependent upon its ability to maintain monopoly power in the non-firm market. If the Commission is correct in predicting the emergence of a reasonably competitive market in non-firm transmission, then competition should drive market prices down toward marginal cost, and the three-way split is in practice only a theoretical price ceiling applicable to PacifiCorp alone. Our acceptance of the Commission's prediction, therefore, requires us also to reject the petitioners' attack upon the Commission's authorization of three-way split pricing.
 
 IV. CONCLUSION
 
 38
 In view of the foregoing, we grant the petitions for review in part, and remand this matter to the FERC for further consideration of the exclusion of QFs and end users from access to firm transmission over PacifiCorp's system. We deny the petitions as to all other matters.
 
 
 39
 So ordered.
 
 
 
 *
 Intervenors PacifiCorp, et al., argue that petitioner Environmental Action has no standing to seek review because it alleges no injury in fact. Because petitioner Nucor raises all of the issues addressed by Environmental Action, we need not decide whether the latter organization has standing. See City of Los Angeles v. NHTSA, 912 F.2d 478, 485 (D.C.Cir.1990)